**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 49667**

| | | |
|---|---|---|
| JOHN BRADBURY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | Lewiston, April 2023 Term |
| | ) | |
| v. | ) | Opinion filed: July 10, 2023 |
| | ) | |
| CITY OF LEWISTON, | ) | Melanie Gagnepain, Clerk |
| a municipal corporation, | ) | |
| | ) | |
| Respondent. | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce County. Richard D. Greenwood, Senior District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>reversed in part</u>.

John Bradbury, Lewiston, Appellant Pro Se. John Bradbury argued.

Clements, Brown & McNichols, PA, Lewiston, for Respondent. Bentley Stromberg argued.

MOELLER, Justice.

This appeal stems from a lawsuit brought by then-city council member, John Bradbury, to contest whether the City of Lewiston ("the City") had been collecting excessive utility fees and improperly spending municipal funds. Bradbury filed a petition against the City seeking a declaratory judgment and equitable relief. He now appeals the district court's dismissal of most of his claims at summary judgment and raises additional errors for appellate review. For the following reasons, we affirm the decision of the district court in part and reverse in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Bradbury is a resident of the City of Lewiston and was an elected member of its city council. While serving in that capacity, he filed a petition alleging nine causes of action concerning various City funds and services, including those related to water, sanitation, wastewater, city streets, the library, and the municipally-owned Bryden Canyon Golf Course ("Bryden Canyon"). Several of these legal challenges overlap and fall under four main activities: (1) interdepartmental

1

fund transfers from sanitation to finance a new library building and a new irrigation system at Bryden Canyon; (2) the use of sanitation and wastewater fees to repair city streets; (3) the City's payments to private entities for tourism and economic development; and (4) irrigation water provided to Bryden Canyon.

The City operates three utility enterprise funds relevant to this case: one provides and distributes water (the water utility); another collects and treats sewage (the wastewater utility); and a third collects and disposes of garbage, recyclables, and vegetation waste (the sanitation utility). Each utility charges fees to ratepayers who use these respective services. Additionally, the City maintains a "golf course" fund for the operation of Bryden Canyon and a "library fund" for public library services. The City maintains a reserve in each of these respective funds sufficient to conduct their operations for a minimum of three months. Where the City anticipates greater future need, it sometimes maintains even higher reserves.

### 1. Bryden Canyon Golf Course and the City's Library

Bryden Canyon is a municipal golf course that was constructed with City funds between 1972 and 1974. It was built on a parcel of land leased from the Lewiston Airport. Since 1979, the City has leased the facility to a private entity that oversees operation of the golf course. The lease terms include an agreement that the City will provide irrigation water to the golf course as needed. In exchange, the City receives lease payments and a percentage of the total revenues generated by the golf course.

In 2010, the irrigation system at Bryden Canyon failed and required replacement. The city council accepted a bid for a replacement system, but the golf course fund lacked adequate funds to pay for its installation. As a result, the City transferred $1,138,713 from the sanitation utility to the golf course fund, to be repaid with interest over a 30-year period. This transfer was later refinanced into a 20-year repayment plan. No additional funds were raised or collected from ratepayers to carry out this interdepartmental transfer.

The City also owns a library that is governed by an independent board. In 2012, the City concluded that a new public library should be constructed. Because the library fund lacked sufficient capital for a new building, the City transferred $800,000 from the sanitation utility to the library fund, to be repaid with interest over a 20-year period. No rates were raised, nor were additional funds collected, to make the interdepartmental transfer possible. On July 12, 2021, the

2

city council voted unanimously to liquidate and repay the remaining balance on the library fund transfer.

### 2. Street Impact Fees

The City provides curbside garbage pickup services to all City residents. About twenty-five years ago, the City reviewed its existing policies concerning cost allocation across its enterprise funds. It became concerned about the costs of street maintenance and repair, particularly in light of research showing that repeated heavy sanitation vehicle traffic can accelerate deterioration and wear to roads. The City determined to account for the excess wear and tear on the pavement from sanitation vehicles by assessing an annual charge to the sanitation fund. It was called a "street impact fee" and was equal to 7% of the sanitation fund's annual expenditures related to heavy sanitation vehicles.

In 2012, the City considered assessing the street impact fee to its water and wastewater funds as well. Wastewater and water services became a similar concern and point of focus for cost allocation "because maintenance on existing water and sewer lines regularly requires street cuts,"—i.e., cutting or removing sections of the street to access the underground lines—which shortens the lifespan of a road surface. Thus, the City set an additional street impact fee at 2% of total annual revenues in the water and wastewater funds. Bradbury alleged that since the additional fee was imposed, these street impact fees have diverted $935,000 from the water fund; $990,000 from the wastewater fund; and $3,483,668 from the sanitation fund. Dan Marsh, the City's chief financial officer, declared that these fees were consistent and comparable to charges imposed by other municipalities to allocate costs.

### 3. Payments to Private Entities: Valley Vision and Visit Lewis-Clark Valley

Bradbury alleges that the City made improper donations to two local businesses: Valley Vision and Visit Lewis-Clark Valley. The record shows that the City pays Valley Vision $40,000 per year "for assistance in recruiting and retaining businesses, assisting with City workforce development and assistance with the creation of a community strategic plan." The City also pays Visit Lewis-Clark Valley $15,000 per year for "tourism activities within the City that benefit the general public and to act as the City's tourism liaison and also to develop an economic development tourism strategy." The City claims that both businesses provide regular reports to the City on their promotional services and other activities performed on behalf of the City.

### 4. Water Services to Bryden Canyon Golf Course

3

The City's water utility provides services to most of its residents. Lewiston Orchards Irrigation District ("LOID") provides water services to other residents living in the areas not served by the City. Bradbury does not receive water services from the City. At all times relevant to this litigation he has been a LOID water customer.

Bryden Canyon has obtained water from both the City and LOID over the years. For a few decades following its initial operations, Bryden Canyon purchased surplus irrigation water from LOID at competitive rates. This continued through the early 1990s until the supply was deemed too unreliable. In 1998, the City constructed a well and pumping station to serve Bryden Canyon. It was funded in part by a special assessment fee collected from golf course users, which ultimately paid for approximately 40% of the well's total cost.

From 1998 to 2012, Bryden Canyon's use of the well water was not metered. The City considered the golf course fund to be a part owner of the well, and consequently "believed that it would be improper to charge the Golf Fund anything other than a proportionate share of the costs of operation, maintenance and depreciation of [the well]." In 2000, the City Public Works Department calculated that cost to be $27,600 per year, with an annual 2% increase to account for inflation. The City has since allocated that annual sum from the golf course fund to its water enterprise fund in bi-annual payments.

Despite the installation of a new irrigation system in 2010, this flat water rate has continued to be paid towards the "maintenance, upkeep and depreciation of" the well and "in exchange for all irrigation water needs of the municipal golf course." The city council even amended the Lewiston City Code in 2019 to specifically permit this flat fee arrangement with Bryden Canyon for irrigation water, citing Lewiston City Code section 36.5-5(c). The amended city code also provides the city council with discretion to allocate funds from the City's general fund to the water fund "to offset, in full or in part, the costs associated with providing water for the public purposes" of Bryden Canyon or other municipal water needs. LCC § 36.5-5(d). Today, the City continues to provide water to Bryden Canyon in exchange for lease payments, and it transfers approximately $36,000 per year from the golf course fund to the City's water fund "for water provided to the golf course." The City's water fund has also bought out the golf course fund's ownership share in the well to help pay down the earlier transfer from the sanitation fund.

4

### 5. *Procedural History*

Bradbury first raised his concerns of illegal City activities in a city council meeting held on August 24, 2020. He claims he moved to amend the budget "to purge the illegal acts and . . . resolve the problems," but the other council members refused to second his motion. As a result, Bradbury filed this action against the City on March 29, 2021. He stated that he brought the petition "in his capacity of City Councilor and in his capacity [as] a utility ratepayer on his own behalf and the behalf of all residents of Lewiston rate payers." In his petition, he asked the district court to declare the City's conduct, as alleged in the various causes of action, to be illegal. He also asked the court to order the City to repay "the loans to the utilities and order funds repaid to ratepayers for the excess fees collected."

The City filed a motion to dismiss the petition, arguing that: (1) Bradbury lacked standing to bring his claims, (2) the district court lacked authority to grant relief, and (3) several claims were time barred. The City also filed a motion to strike because Bradbury's pleadings included confidential research memoranda prepared by the city attorney and submitted to the Lewiston city manager. The City argued that these materials were privileged communications between an attorney and client. The City did not object to Bradbury's submission of other materials from the City's records. The district court granted the City's motion to strike in a bench ruling, ordering the documents to be stricken from the record but retained under seal for any potential appellate review.

Bradbury filed a motion asking the district court to reconsider its ruling on the motion to strike, which the district court denied. The court determined that the memoranda "were made for the purpose of facilitating the rendition of professional legal services by [the City's attorney] to the City." Thus, the City could assert the privilege afforded to it under Idaho Rule of Evidence 502. The district court further clarified that only the communication from the city attorney to the city manager was privileged.

Next, the district court denied the City's earlier motion to dismiss. While the court agreed with the City that Bradbury lacked legislative standing to bring a suit against the City as a member of the city council, it determined that Bradbury could bring a challenge to unlawful expenditures as a ratepayer. The court also concluded that the remaining issues were "better left to trial on the merits or summary judgment on a better developed record." Following these decisions, the court set a schedule for filing summary judgment motions and ordered briefing.

5

At that point, Bradbury again attempted to introduce the privileged memoranda from the city attorney by filing another motion to unseal the documents. He also filed the sealed documents—in an *unsealed* attachment—to his amended brief in support of his motion for summary judgment. The City filed a second motion to strike the privileged materials from the court record, which the district court granted. The court subsequently ordered that Bradbury's amended brief and attachments would be sealed in their entirety.

After the parties filed cross-motions for summary judgment, Bradbury filed a motion to intervene as counsel on behalf of Mark Edelblute—a City resident and water ratepayer. The City opposed the motion to intervene, arguing that this was a belated attempt by Bradbury to cure a jurisdictional defect. The district court denied Edelblute's motion from the bench on finding it untimely. It then formally denied Bradbury's earlier motion to unseal the privileged documents and attachments in the record.

On reviewing the cross-motions for summary judgment, the district court made various conclusions on Bradbury's nine causes of actions:

- First, the district court concluded that the interdepartmental transfers of funds that paid for the new irrigation system and library, respectively, were not unconstitutional debts or violations of Idaho Code section 63-1311, nor were they unconscionable. Instead, the court found that the City lawfully transferred reserve funds as a loan from one city account to another to meet a municipal need.

- Next, the district court addressed the street impact fees collected from the water, wastewater, and sanitation funds. The court agreed with Bradbury that these fees amounted to an unconstitutional and blanket tax on ratepayers for street repairs. The district court granted Bradbury's motion for summary judgment on this single cause of action. However, the court also determined that Bradbury only brought the lawsuit in his individual capacity. Because he failed to bring an appropriate class action, Bradbury could not argue that all ratepayers were entitled to a refund. Additionally, the court held that Bradbury's failure to provide a notice of claim for damages under the Idaho Tort Claims Act also barred his individual recovery.

- The district court then examined the City's payments to Valley Vision and Visit Lewis-Clark Valley. It concluded that the record lacked any evidence that the payments were donations, as Bradbury contended; rather, the record evidenced that the City held

6

contractual relationships and ongoing business agreements with both entities to promote economic development and tourism.

- On the final causes of action, the district court concluded that because Bradbury is not a City water fund ratepayer, he lacked standing to challenge (1) the City's allocation of water to Bryden Canyon and (2) the City's ordinances that permitted a flat-fee agreement between them. The district court did not directly address the merits of Bradbury's claims regarding misuse of City water operations in connection with Bryden Canyon.

Based on these findings and conclusions, the district court granted and denied the parties' summary judgment motions in part. It granted Bradbury's motion concerning the unconstitutional street impact fees, but otherwise granted the City's motion for summary judgment and dismissed his remaining causes of action. The district court issued a declaratory judgment that declared the street impact fees an illegal tax and prohibited the City from imposing and collecting such charges. The rest of Bradbury's claims were dismissed with prejudice.

The City filed a motion to reconsider on the issue of street impact fees, arguing that new circumstances rendered the street impact fees to the sanitation fund a moot issue. During the course of litigation, the City approved a new franchise agreement with a private sanitation company "that the City has long contracted with" to perform garbage collection and waste-hauling services. This revised agreement included a franchise fee. When the agreement became effective December 1, 2021, the City discontinued the street impact charges previously assessed to the sanitation fund. The City stated that it had no plans to reinstate the charges. As for the street impact fees charged to the water and wastewater funds, the City asked the district court to clarify its decision. The City wanted to know if it would be "prevent[ed] . . . from re-imposing a similar charge in the future [if]it can be demonstrated that ratepayers are ultimately asked to pay nothing more than their pro-rata share of repairing street cuts made necessary by the utility services they actually have consumed."

Bradbury opposed this motion, arguing that the City had its chance to make its record. He then asked the district court for leave to depose Dan Marsh, the City's financial advisor, for further discovery. The district court denied both of these motions. It refused to "clarify" its decision by determining whether any new procedures to charge the wastewater utility for street repairs could be legal. Because the question was not framed in the pleadings, the court declined to express an

opinion on the issue on reconsideration. Aside from clarifying a typographical error, the district court stood by its earlier decision in its entirety.

Bradbury timely appealed the adverse rulings on summary judgment. The district court then issued its decision regarding attorney fees. While each party sought attorney fees and costs, the district court concluded there was no prevailing party in the action given the mixed results. As for the City, the district court reasoned that it would not be entitled to attorney fees and costs even if it had been the prevailing party at summary judgment. The court determined that the City could not establish that Bradbury pursued the action "without a reasonable basis in fact or law," as is required under Idaho Code section 12-117. The district court also concluded that Bradbury's claim for attorney fees failed on two additional grounds: (1) he could not establish a legal precedent for attorney fees under the private attorney-general doctrine where he was a pro se litigant, and (2) he failed to meet the requirements of Idaho Rule of Civil Procedure 54. Accordingly, the district court declined to award any attorney fees or costs to either side.

### 6. *The Sealed Exhibits*

Pertinent to this appeal is an issue concerning sealed exhibits and whether they are privileged materials. These documents consist primarily of two research memoranda authored by the city attorney and addressed to the city manager. Both memoranda have "Attorney-Client Privilege" stamped across the top of the first page, and each discuss the legality of the street impact fees charged to the City's utility funds amongst other issues.

Bradbury's amended petition, along with its attached evidentiary exhibits, were submitted as one document to the district court. Because the court concluded it was "not practical to seal only that portion of the record containing the offending documents," it sealed Bradbury's submission in its entirety. The sealed portion of the record includes much of Bradbury's briefing and evidentiary exhibits, including: an excerpt from the deposition of Dan Marsh; the services agreement between the City and Visit Lewis-Clark Valley; the services agreement between the City and Valley Vision; an email detailing the amount and costs of Bryden Canyon's irrigation water; documents detailing the interdepartmental transfers/loans between the sanitation, library, and golf course funds; the city attorney's research memoranda to the city manager; and additional documents.

## II. STANDARD OF REVIEW

8

When this Court reviews a summary judgment ruling, we apply the same standard used by the district court in ruling on that motion. *Hill-Vu Mobile Home Park v. City of Pocatello*, 162 Idaho 588, 592, 402 P.3d 1041, 1045 (2017). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). In reaching this determination, we liberally construe all disputed facts, and draw all reasonable inferences in the record, in the light most favorable to the party opposing the motion. *Hill-Vu*, 162 Idaho at 592, 402 P.3d at 1045; *Infanger v. City of Salmon*, 137 Idaho 45, 47, 44 P.3d 1100, 1102 (2002). "If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review." *Hill-Vu*, 162 Idaho at 592, 402 P.3d at 1045.

This Court similarly reviews a trial court's decision to grant or deny a motion for reconsideration using the same standard of review used by the lower court in ruling on the motion. *Ciccarello v. Davies*, 166 Idaho 153, 159, 456 P.3d 519, 525 (2019). As we have explained:

> If the decision was within the trial court's discretion, we apply an abuse of discretion standard. On the other hand, when reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment.

*Id.* (quoting *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012)). Because this case involved both a summary judgment motion and a motion for reconsideration following summary judgment, the question before us is whether the new evidence presented a genuine issue of material fact to avoid summary judgment. *See Fragnella*, 153 Idaho at 276, 281 P.3d at 113.

## III. ANALYSIS

This appeal presents constitutional and statutory challenges to certain City activities, including interdepartmental transfers of its enterprise funds and annual payments to two private entities. There is also a question of standing over the right to challenge the City's allocation of irrigation water to Bryden Canyon. Bradbury contends that Lewiston has a "pattern of using [its] utilities as a cash cow to pay for projects unrelated to the services they are created to provide." The City maintains that the district court correctly granted it summary judgment on all claims except the street impact fees. While it voices disagreement with the district court's conclusion that the street impact fees were an illegal tax, the City "does not challenge that ruling." Beyond these claims of illegal activities over municipal funds are additional issues of evidence and attorney fees. Thus, we will address the issues raised on appeal as four broad categories: (A) the district court's

refusal to unseal privileged materials, (B) Bradbury's constitutional and statutory challenges to the City's activities, (C) whether there was error in the district court's decision to not award attorney fees below, and (D) whether either party is entitled to attorney fees on appeal.

### A. The district court did not abuse its discretion in refusing to unseal privileged attorney-client materials.

Bradbury argues that the city attorney's memoranda, which discussed the potential illegality of city practices, are not privileged materials because they were not prepared to provide professional legal services in confidentiality. Bradbury argues in the alternative that, even if the materials were privileged, the privilege was waived when the city attorney disclosed the information to a third party. The City responds by noting that the district court correctly determined that disputed exhibits submitted by Bradbury were privileged materials between the City and its attorney. Moreover, since it is the City's privilege to assert, it has clearly not been waived.

When this Court reviews a lower court's decision regarding sealing or redacting judicial records, it reviews for an abuse of discretion. *State v. Turpen*, 147 Idaho 869, 872, 216 P.3d 627, 630 (2009); *Doe v. State*, 153 Idaho 685, 687, 290 P.3d 1277, 1279 (Ct. App. 2012). Thus, this Court considers whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). While not expressly stated, Bradbury seems to contest whether the district court acted consistently with the legal standards applicable to it. Thus, the inquiry before us is whether the district court correctly determined the memoranda were confidential communications protected by attorney-client privilege.

The Idaho Rules of Civil Procedure permit broad discovery of matters "relevant to any party's claim or defense," so long as it is not privileged. I.R.C.P. 26(b)(1). If privileged, the matter is protected from discovery. *See id.*; I.R.E. 502. The burden of showing that information is privileged falls on the party asserting the privilege. *Kirk v. Ford Motor Co.*, 141 Idaho 697, 704, 116 P.3d 27, 34 (2005).

The general rules of attorney-client privilege are defined in Rule 502 of the Idaho Rules of Evidence, which states:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the

rendition of professional legal services to the client which were made (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the client's lawyer and the lawyer's representative, (3) among clients, their representatives, their lawyers, or their lawyers' representatives, in any combination, concerning a matter of common interest, . . .

I.R.E. 502(b). A "client" is defined as "a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer." I.R.E. 502(a)(1). A communication is "confidential" if it is "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." I.R.E. 502(a)(5). *See also Kirk*, 141 Idaho at 704, 116 P.3d at 34.

Here, the district court correctly determined that the memoranda are privileged. The City is undoubtedly a client and the city attorney is its lawyer. The city attorney provided professional legal services to the City in the form of two research memoranda that were submitted directly to the city manager. The communications were conspicuously marked with a stamp designating them "attorney-client privilege" and each discussed pertinent legal issues concerning the City. As the district court reasoned, "[t]he letter/memos of May 3, 2017 and March 19, 2018 were made for the purpose of facilitating the rendition of professional legal services by [the city attorney] to the City." Importantly, the district court found that only the two memoranda exchanged between the city attorney and city manager were privileged. The court did not completely foreclose Bradbury from attempting to make his point in other ways, noting: "The fact that the lawyer's statements are privileged does not mean that any facts recited in the communication cannot be proven by other means." Indeed, the court recognized that the underlying facts referenced in the memoranda were not privileged information. Despite this ruling, Bradbury repeatedly attempted to reintroduce the privileged memoranda without court approval, attaching them as evidence to various briefs and documents without submitting them under seal. The court eventually sealed these filings in their entirety to protect the privileged information.

Bradbury contends that the memoranda cannot qualify as privileged because the City did not *seek* the attorney's advice or prompt the research; the city attorney apparently conducted this research and prepared the memoranda to the city manager on her own initiative. However, Bradbury points to nothing in Idaho law to support his position. The Idaho Rules of Evidence do

11

not require a confidential communication to be based upon a client's inquiry. In fact, an attorney is often called upon to give proactive legal advice to clients in order to protect them from legal hazards that have not yet even occurred to the client. Therefore, a "client has a privilege to refuse to disclose . . . confidential communications *made for the purpose of facilitating the rendition of professional legal services . . .*" I.R.E. 502(b) (emphasis added). Of course, professional legal services are often prompted by a client's specific questions and pursuit of legal advice. But to define a confidential communication as predicated on a client's inquiry alone would eliminate a large swath of privileged attorney-client communications and serve as a disincentive for lawyers to provide effective, proactive legal representation. As happened here, an attorney may simply seek to provide current research and guidance to a client when new information becomes available. Bradbury's argument would add a requirement for asserting attorney-client privilege that does not currently exist in the Idaho Rules of Evidence and which is unwarranted.

We also do not agree that a waiver of the privilege occurred here. Bradbury's appellate briefing alleges there was a waiver, but he does not specify how the city attorney "disclosed" or "published" the materials, nor does he specify the identity of the third parties. Even when an issue is explicitly set forth in the party's brief, we will not consider an issue that "is only mentioned in passing and not supported by any cogent argument or authority." *Dep't of Fin., Sec. Bureau v. Zarinegar*, 167 Idaho 611, 622, 474 P.3d 683, 694 (2020). Such is the case here where Bradbury alleges waiver but does not specify how, when, or to whom disclosure of the memoranda occurred. More importantly, it cannot logically be inferred that the City has waived its privilege where (1) nothing in the record indicates that it has waived its privilege previously and (2) it has consistently asserted its privilege throughout these proceedings.

Accordingly, we affirm the district court's conclusion that the memoranda contained privileged attorney-client communications and that Bradbury's waiver argument is not properly supported. The City, as a client, had the privilege to refuse to disclose and to prevent any other person from disclosing its confidential attorney/client communications. I.R.E. 502(b). Therefore, we conclude that the district court applied the correct legal standards applicable here and did not abuse its discretion in keeping the memoranda sealed.

**B. Bradbury has failed to show that the City's actions were unconstitutional or amounted to unlawful conduct.**

Below, Bradbury raised nine causes of action in his petition for declaratory and equitable relief filed with the district court. While he prevailed in his claim that the street impact fees were

an illegal tax by the City, his remaining eight claims were all dismissed on summary judgment. Bradbury appeals the dismissal of his remaining claims, as well as the district court's determination that a refund of the illegal fees was not an appropriate remedy. The City has not appealed any of the district court's decisions. Accordingly, we must determine whether the district court correctly awarded summary judgment to the City on Bradbury's remaining challenges. Almost every issue contemplates whether the City's actions concerning certain municipal funds violated either the Idaho Constitution, a provision of the Idaho Code, or were otherwise unlawful. In the matter of Bryden Canyon's irrigation water, this Court must make a determination of whether Bradbury has standing to challenge the water allocation and flat-fee arrangement. We will address each issue in turn.

### 1. The City's interdepartmental transfers of funds did not violate Article VIII, section 3 of the Idaho Constitution.

The first three issues raised by Bradbury address two interdepartmental fund transfers made by the City: first, when the City transferred $1,138,713 from the sanitation utility fund to the golf course fund for construction of a new irrigation system at Bryden Canyon; and second, when the City transferred $800,000 from the sanitation fund to its library fund to purchase and remodel a new building for public library services. Bradbury contends that these transfers violated Article VIII, section 3 of the Idaho Constitution by incurring a debt that exceeds a year's revenue without approval by a majority vote, and that the transfers do not fall within the Constitution's exception for "ordinary and necessary expenditures." The City responds that Article VIII, section 3 "as interpreted by this Court, has no plausible application to either of the transfers challenged here" because interdepartmental transfers of existing municipal funds are "plainly permitted" by Idaho Code section 50-1014. The essence of both sides' arguments is reflected in the language the parties use to describe these transactions. In its words, the City refers to these transactions as "transfers," while Bradbury insists they are "loans." There is no dispute that both transactions were completed without submission to the voters for approval. Accordingly, we must address whether these transfers unconstitutionally incurred a debt upon the City.

The Idaho Constitution provides that municipalities may not incur certain debts or liabilities without first submitting the proposed expenditure to the voters for supermajority approval in a special election. *Hoffman v. City of Boise*, 168 Idaho 782, 784, 487 P.3d 717, 719 (2021). As provided in Article VIII, section 3 of the Idaho Constitution:

13

> No county, city, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose[.]

An exception, known as the "proviso clause," provides that no voter approval is required if the expenditure is for "ordinary and necessary expenses authorized by the general laws of the state." IDAHO CONST. art. VIII, § 3. *See also City of Challis v. Consent of Governed Caucus*, 159 Idaho 398, 400–01, 361 P.3d 485, 487–88 (2015). The words "ordinary and necessary" are to be read in the conjunctive. *Challis*, 159 Idaho at 401, 361 P.3d at 488.

The purpose of Article VIII, section 3 is to protect Idaho's voters and ensure that a local government operates within its available revenue. This Court has held that Article VIII, section 3 was designed to "protect taxpayers and citizens of political subdivisions . . . who would bear the consequences of the subdivision incurring excessive indebtedness." *Hoffman*, 168 Idaho at 785, 487 P.3d at 720 (quoting *Koch v. Canyon Cnty.*, 145 Idaho 158, 162, 177 P.3d 372, 376 (2008)). Thus, this section of the Idaho Constitution requires local governments to "operate on a pay-as-you-go basis, unless voters approve otherwise." *Id.*

> The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials, thought best to sacrifice a measure of efficiency for a degree of safety.

*Williams v. City of Emmett*, 51 Idaho 500, 505, 6 P.2d 475, 476 (1931) (citation omitted).

As to its interdepartmental transfers of funds, the City reasons that Article VIII, section 3 is meant to prohibit long-term indebtedness or liability to *third parties*. The district court agreed with this view. It is true that many of the cases this Court has addressed over the last century involved challenges to loans or contracts between a political subdivision and a third party (private or governmental). *E.g.*, *Challis*, 159 Idaho at 399, 361 P.3d at 486 (contracting with a private engineering firm to repair the city's drinking water distribution system); *City of Idaho Falls v. Fuhriman*, 149 Idaho 574, 575, 237 P.3d 1200, 1201 (2010) (entering a 17-year power sales agreement with the United States, Department of Energy, acting by-and-through the Bonneville Power Administration); *Koch*, 145 Idaho at 159–60, 177 P.3d at 373–74 (leasing real property

14

from a private trust to construct a jail and other county facilities). However, we have also addressed challenges to a local government's internal operations and funding. *E.g.*, *Hoffman*, 168 Idaho at 783, 487 P.3d at 718 (city ordinances allocating tax increment financing to the city's urban renewal agency); *Reynolds Const. Co. v. Twin Falls Cnty.*, 92 Idaho 61, 66, 437 P.2d 14, 19 (1968) (challenging the county commissioners' transfer of general funds to a building fund).

In situations where a party raised the constitutional challenge, we first evaluated whether an expenditure creates the type of liability with which Article VIII, section 3 is concerned. *See Hoffman*, 168 Idaho at 785, 487 P.3d at 720. This corresponds with the historically broad application of Article VIII, section 3. The Framers used specific terminology, such as "liability" and "indebtedness," "to cover all kinds and character of debts and obligations for which a city may become bound, and to preclude circuitous and evasive methods of incurring debts and obligations to be met by the city or its inhabitants." *Vill. of Moyie Springs v. Aurora Mfg. Co.*, 82 Idaho 337, 344, 353 P.2d 767, 771 (1960) (quoting *Feil v. City of Coeur d'Alene*, 23 Idaho 32, 50, 129 P. 643, 649 (1912)).

The key question here is the applicability of Article VIII, section 3. As noted, the Idaho Constitution prohibits a local government from incurring "any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year," without approval from a supermajority of voters in a special election. IDAHO CONST. art. VIII, § 3. Yet it does not apply to every budget decision and expenditure; there must be some "indebtedness, or liability" to trigger Article VIII, section 3's application. *See Hoffman*, 168 Idaho at 786, 487 P.3d at 721. As we articulated in *Hoffman*:

> . . . simply because a decision may affect the City's budget in the future does not mean it is a liability that must be submitted to voters for approval under the Idaho Constitution. To adopt such an interpretation of article VIII, section 3 would radically expand the scope of the section to apply to nearly any action by a government subdivision.

*Id. See also In re Boise Cnty.*, 465 B.R. 156, 177 (Bankr. D. Idaho 2011) ("As indicated by *Butler* and *Lloyd*, merely changing the form of an already existing indebtedness or liability does not implicate Idaho Constitution, article VIII, § 3. Consequently, any application of article VIII, § 3, must be to the initial indebtedness or liability.").

An additional precedent is instructive in how we previously dealt with an interdepartmental transfer of money. In *Reynolds Construction, Co. v. Twin Falls County*, the county commissioners adopted a resolution to appropriate $140,000 from the county's general reserve and "supplement

15

thereto to be designated as the Building Budget." 92 Idaho at 63, 437 P.2d at 16. This transfer was completed under a declaration of emergency to construct a courthouse annex to provide necessary accommodations for a new district judge who would have a resident chambers in Twin Falls, Idaho. *Id.* A collective group of corporations, partnerships, and individual business owners challenged the courthouse construction as an illegal expenditure of funds. *Id.* at 62, 437 P.2d at 15. In its analysis, this Court determined that both constitutional and statutory law governed and placed different limitations on how the county could fulfill its duty to provide a necessary courthouse. *Id.* at 66, 437 P.2d at 19. This Court explained, that the "county commissioners . . . are limited in fulfillment of this duty to the extent that they cannot incur any indebtedness or liability in any year in excess of revenue provided (Idaho Const. Art. 8, [§] 3 and I.C. [§] 31-1605), and they cannot transfer any money from one fund to another, except in cases expressly provided and permitted by law (I.C. [§] 31-1502)." *Id.* Where "current funds [were] to be expended for such purpose, such funds must be budgeted, and expenditures made within these limits (I.C. [§] 31-1605)." *Id.*

The analysis in *Reynolds* is instructive. This Court separated the application of Article VIII, section 3 from the statutory grounds that governed interdepartmental fund transfers. This demonstrates that there is a difference between a local government taking on indebtedness to a third party and that government making an internal transfer of money to a different fund. This Court's analysis also indicates that an internal transfer does not inherently create a debt or liability with which Article VIII, section 3 is concerned. As stated by the *Reynolds* Court, statutes control internal transfers: "they cannot transfer any money from one fund to another, except in cases expressly provided and permitted by law (I.C. [§] 31-1502)." *Id.*

Here, we agree with the district court that the challenged activities were proper interdepartmental transfers rather than loans. While the City characterized these internal transfers as "loans" in some of its bookkeeping, they were, in effect, transfers from one of the City's funds to another. Importantly, these transfers did not incur an obligation or liability that exceeded the revenues already provided for that year. The City already had the revenue, albeit in a different account. Additionally, the transfers did not create a liability with any third party—governmental or private.

Idaho law permits a municipality to "transfer any money from one fund to another" where "expressly provided and permitted by law." *See Reynolds*, 92 Idaho at 66, 437 P.2d at 19; I.C. § 50-1014. The Idaho Code specifically permits "[t]he city council of the cities" to "transfer an

16

unexpended balance in one fund to the credit of another fund," I.C. § 50-1014, and makes no distinction between the types of funds that can be transferred. We agree with the district court that these internal transfers did not create the debt or liability contemplated by Article VIII, section 3 of the Idaho Constitution. Indeed, Idaho's statutory framework corresponds with the majority rule across jurisdictions that "the allocation of net profits from a municipally owned and operated utility enterprise to purposes other than those connected with the enterprise itself is permissible in the absence of statutory prohibition." *Killion v. City of Paris*, 241 S.W.2d 524, 527 (Tenn. 1951). *See also* 165 A.L.R. 854 ("Generally, the determination of the questions of what disposition may be made of income or earnings derived from revenue-producing municipal enterprises, and the manner thereof, depends primarily on the construction and effect of specific statutory provisions.").

We conclude that the contested interdepartmental fund transfers made by the City did not offend the "pay-as-you-go" mandate of the Idaho Constitution, as set forth in Article VIII, section 3. In considering all the disputed facts, and drawing all reasonable inferences in the record in the light most favorable to Bradbury, we conclude that the City was entitled to summary judgment as a matter of law on this issue. Accordingly, we affirm the district court's award of summary judgment to the City on this claim.

### 2. *Bradbury did not offer any evidence showing that the City's interdepartmental transfers of funds violated Idaho Code section 63-1311.*

Bradbury next contends that the interdepartmental transfers violated Idaho Code section 63-1311. He specifically contends that "[a]n unexpended balance, by definition in excess of liabilities and reserves, violates the mandate that a utility may only collect fees reasonably 'related to, but not exceeding, the actual cost of its services.' " The City asserts that the "Petitioner offered no evidence showing that a 3-month operational reserve is in any way unusual or outside of industry norms. He also offered no evidence showing that the sanitation fund's operational reserves exceeded that benchmark at any time relevant to this litigation." Below, the district court determined that Bradbury failed to introduce evidence that the reserves held by the City were unreasonable or in violation of Idaho Code section 63-1311. We agree with the district court's analysis.

Idaho Code section 63-1311 permits "the governing board of any taxing district" to "impose and cause to be collected fees for those services provided by that district which would otherwise be funded by property tax revenues." The fees collected under this section "shall be

17

reasonably related to, but shall not exceed, the actual cost of the service being rendered." I.C. § 63-1311. Violations of this provision turn on evidence supporting a finding on the actual cost of services. *See N. Idaho Bldg. Contractors Ass'n v. City of Hayden*, 158 Idaho 79, 81, 343 P.3d 1086, 1088 (2015).

There are two key problems with Bradbury's argument. First, he makes an assumption that compliance with one statute is an automatic violation of another. For example, he asserts that if a municipality transfers "an unexpended balance in one fund to the credit of another fund" pursuant to Idaho Code section 50-1014, that balance inherently proves that the city has been collecting fees in excess of the reasonable rates and actual costs of utility services. Thus, he maintains that this is an automatic violation of Idaho Code section 63-1311. Second, Bradbury offers no supporting evidence that the fees were excessive or unrelated to the actual cost of sanitation services. He merely alleges the City is using its utilities as a "cash cow" to pay for other municipal needs, relying only on the fact that $1,138,713 was transferred from the sanitation fund to the golf course fund in 2010, and $800,000 was transferred from the sanitation fund to the library fund in 2012.

We do not agree that a positive account balance alone, based on the existence of unexpended revenue, is proof that the City overcharged its sanitation ratepayers in order to pay for a library or irrigation system. Likewise, we do not agree that the mere existence of an unexpended balance, or a lawful transfer under Idaho Code section 50-1014, establishes an inherent violation of section 63-1311. To accept these arguments disregards any other reasonable explanation for the positive balance, including the City's duty to maintain "self-supporting" facilities. I.C. § 50-1032. A utility's "cash working capital is a recognition of the sum which the utility needs to supply from its own funds (rather than the rate-payer's) to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues." *Boise Water Corp. v. Idaho Pub. Utilities Comm'n*, 97 Idaho 832, 835, 555 P.2d 163, 166 (1976). The presence of a positive balance or *some* excess revenue is necessary for self-sufficiency in the event of necessary "acquisition, construction, reconstruction, improvement, betterment or extension of any works or to rehabilitate existing . . . facilities." *E.g.*, I.C. § 50-1033. Idaho Code section 50-1033, for example, specifically "allows for the accumulation of reserves" for this purpose in connection to electrical generation facilities, "and there is no constitutional prohibition to this procedure." *Id.*

This is not to say that an excessive balance in utility revenues could *never* serve as evidence of suspicious activity or rates. An unusually high balance could suggest impropriety, but that

18

analysis would be dependent on evidence particular to the city and its respective allocation of funds. Here, Bradbury has provided no information that suggests any mis-, mal-, or nonfeasance on the part of the City. As found by the district court, "the record is silent regarding the reasonableness of the reserves." The City provided evidence to show that the golf course and library transfers occurred in 2010 and 2012, respectively, and that the sanitation fund is *not* "financially sustainable" in the long term. There is also evidence to suggest one of the transfers has been repaid in full. While we note that a city's practice of transferring funds out of unsustainable utilities might be concerning, we ultimately agree with the district court's assessment that the City cannot be presumed to have overcharged ratepayers. Bradbury has failed to provide evidence to the contrary. Accordingly, we affirm the district court's award of summary judgment to the City on this claim.

### 3. *The payments to Valley Vision and Visit Lewis-Clark Valley were for contracted services.*

Bradbury next challenges the payments made by the City to two private entities—Valley Vision and Visit Lewis-Clark Valley—alleging that they were improper "donations." The City contends that these are business relationships that began with oral agreements and have since become written contracts. The City further explains that it has long held term contracts with both organizations even if the pre-existing understandings were only reduced to writing in 2018, and that "Petitioner offered no evidence that demonstrated that these agreements were fictitious." Bradbury asserts that these are not binding contracts but donations made to private entities. The district court agreed with the City that the record evidenced longstanding contracts and business arrangements, and the payments were not unconstitutional donations. We agree with the district court's conclusion that based on substantial evidence from the record, the City's payments to Valley Vision and Visit Lewis-Clark Valley are for contracted services.

Cities cannot donate their funds to private enterprises. Article XII, section 4 of the Idaho Constitution provides that "No . . . city, or other municipal corporation, . . . shall ever . . . make donation or loan its credit to, or in aid of, any such company or association." This provision "imposes an absolute prohibition on any donation or loan of credit by a municipality to a private enterprise." *Utah Power & Light Co. v. Campbell*, 108 Idaho 950, 953, 703 P.2d 714, 717 (1985) (citing IDAHO CONST. art. VIII, § 4 and art. XII, § 4). However, cities retain the right to "contract and be contracted with." I.C. § 50-301. As stated by this Court in *Utah Power & Light*: "It is obvious that the framers of the Idaho Constitution had no intention of limiting the power of

19

municipalities to *contract* in furtherance of the public interest, but rather of limiting loans or donations of public credit." 108 Idaho at 954, 703 P.2d at 718 (emphasis included).

Bradbury compares this situation to that of *Fluharty v. Board of Commissioners of Nez Perce County*, 29 Idaho 203, 158 P. 320 (1916) (superseded by statute), and *Village of Moyie Springs v. Aurora Manufacturing Co.*, 82 Idaho 337, 353 P.2d 767 (1960). In each of those cases, this Court concluded there had been a donation made to a private enterprise that was in violation of Article XII, section 4 of the Idaho Constitution. In *Fluharty*, the county—through its board of commissioners—appropriated $2,500 "for the use and benefit" of a livestock association to defray the expenses of a private fair. 29 Idaho at 208, 158 P. at 321. While this Court recognized that the county's purposes were "praiseworthy and beneficial to the public," we determined that the appropriation was an unlawful donation to a private corporation—an act strictly prohibited by the Idaho Constitution. *Id.* at 211, 158 P. at 322.

More recently, in *Village of Moyie*, this Court analyzed the constitutionality of a statute that authorized municipalities to issue revenue bonds to finance the acquisition of land and construction of facilities that were to be leased to private enterprises. 82 Idaho at 339–41, 353 P.2d at 768–69. This Court determined that the statute, and corresponding ordinance enacted by the plaintiff, violated the Idaho Constitution because the primary purpose of these laws was to benefit private enterprise. *Id.* at 345–46, 353 P.2d at 772–73. This Court explained:

> It is obvious that one of the prime purposes of having the necessary bonds issued by and in the name of a municipality is to make them more readily salable on the market. Thus, the credit of the municipality is extended in aid of the project, regardless of the limitations placed upon the remedy of the purchaser. . . .
>
> It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess. If their issuance by the city is an inducement to industry, some benefits must be conferred, or it would be no inducement at all. Such benefits, whatever form they may take, necessarily must be based on the credit of the city. The loan of its name by a city to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit.

*Id.* Ultimately, this Court held, "public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern." *Id.* at 347, 353 P.2d at 773–74.

In comparing the facts of this appeal to these two cases, the City's agreements with Valley Vision and Visit Lewis-Clark Valley are not analogous to the unconstitutional transactions in

20

*Fluharty* and *Village of Moyie*. Here, there was no appropriation or donation simply given to benefit a private organization. Instead, the transactions at issue here concerned a contract for services whereby the City made annual payments to Valley Vision and Visit Lewis-Clark Valley in exchange for their business services in economic development and tourism. The nature of the services to be performed is designated in written agreements. Thus, the City is not donating money or lending it—it is contracting for specific services with a clear public purpose.

Bradbury has produced no evidence to the contrary, except to reiterate the amount of money each enterprise has received over the course of its business dealings with the City. He has also failed to present evidence that demonstrates the contracts are a false front to "circumvent the prohibition of donations of public money to private organizations," or that the services paid for are not being rendered. While it is concerning that the original contracts were based on oral agreements between the City and the entities, that fact alone does not establish that these were *donations*.

The record demonstrates that the City entered into written service agreements with the two enterprises, with each private entity covenanting to provide the City with specific and needed services. Therefore, we conclude that the district court's determination that the City was entitled to summary judgment on this claim was correct.

### 4. *Bradbury lacks standing to challenge the City's allocation of water to Bryden Canyon.*

In the proceedings below, Bradbury's eighth and ninth causes of action consist of allegations that the City provided "free water" to Bryden Canyon at the expense of City water ratepayers. Bradbury argued this also violated various city ordinances. The district court dismissed these claims because it found Bradbury lacked standing to challenge the City's allocation of water because he was not a City water ratepayer. On appeal, Bradbury argues that he has standing to challenge the City's allocation of water to Bryden Canyon because of "his capacity as a ratepayer of two of the three city utilities and as a city councilor." The City responds that Bradbury has "not demonstrated that he had actually suffered a distinct and palpable injury as a result of these allegations" and it is undisputed that Bradbury "did not pay what he alleges are inflated water rates."

Idaho's standing law substantially mirrors federal standing law. *Gifford v. W. Ada Joint Sch. Dist. #2*, 169 Idaho 577, 582, 498 P.3d 1206, 1211 (2021). It is a subcategory of justiciability and "a threshold determination that must be addressed before reaching the merits." *Id.* This Court has long explained that the core of the standing doctrine is a plaintiff's personal stake in the suit:

The essence of the standing inquiry is whether the party seeking to invoke the court's jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure the concrete adversariness which sharpens the presentation upon which the court so depends for illumination of difficult constitutional questions." As refined by subsequent reformation, this requirement of "personal stake" has come to be understood to require not only a "distinct palpable injury" to the plaintiff, but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct.

*Miles v. Idaho Power Co.*, 116 Idaho 635, 641, 778 P.2d 757, 763 (1989). Thus, "[s]tanding focuses on the party seeking relief and not on the issues the party wishes to have adjudicated." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002).

The general standing analysis requires a plaintiff to demonstrate: "(1) an injury in fact, (2) a 'fairly traceable causal connection between the claimed injury and the challenged conduct[,]' and (3) 'a substantial likelihood the relief requested will prevent or redress the claimed injury.' " *Gifford*, 169 Idaho at 582, 498 P.3d at 1211 (quoting *Young*, 137 Idaho at 104, 44 P.3d at 1159). *See also Associated Press v. Second Jud. Dist.*, 529 P.3d 1259, 1265 (Idaho 2023). However, "even if a showing can be made of an injury in fact," standing may still "be denied when the asserted harm is a generalized grievance shared by all or a large class of citizens." *Young*, 137 Idaho at 104, 44 P.3d at 1159.

The district court relied on our recent decision in *Gifford* to analyze whether Bradbury had standing. Both Bradbury and the City also cite to *Gifford* as support for their standing arguments. In *Gifford*, parents asserted two injuries in their claims: the economic injury suffered by patrons who paid allegedly unconstitutional fees to enroll their children in second half-day kindergarten; and an educational injury where their son was denied the full free education he was entitled to receive under Article IX, section 1 of the Idaho Constitution. 169 Idaho at 582, 498 P.3d at 1211. Although this Court ultimately determined that the parents had standing to pursue the educational injury, we ruled they lacked standing to pursue their claim for an economic injury because the parents "did not pay kindergarten fees." *Id.* at 587, 498 P.3d at 1216. Thus, they "[did] not have standing to seek redress—on their own behalf or on behalf of others—for an economic injury they have not suffered." *Id.* Additionally, the parents could not qualify for this Court's "relaxed" standing analysis, which may occur where: "(1) the matter concerns a significant and distinct constitutional violation, and (2) no party could otherwise have standing to bring a claim." The parents did not meet this standard because there was "a whole class of people who could challenge

the constitutionality of second half-day kindergarten tuition fees; namely, the other patrons who [had] collectively paid West Ada $8 million dollars in such fees." *Id.*

Based on the standard set forth above, the first question before us is whether Bradbury has alleged an injury caused by the City's actions. Bradbury has alleged an economic injury to ratepayers resulting from the City's mismanagement of its water fund and the alleged higher fees incurred because it provided "free" water to Bryden Canyon. However, it is undisputed that Bradbury did not receive water services from the City, nor does he pay any fees. At all times relevant to this litigation he has been a water customer of LOID. Thus, he has not suffered an economic harm himself. As in *Gifford*, Bradbury cannot seek redress for a hypothetical harm he has not suffered. He also cannot bring a vicarious suit on behalf those he alleges have been injured by the City's conduct. Moreover, a whole class of people exists who have standing and can bring suit—namely, the City's water ratepayers who have been paying the allegedly unlawful fees.

Bradbury also claims that the City's "pattern of conduct of managing its utilities fees" affects him "as a consumer of the wastewater and sanitation utilities." But he has not established *how* he is injured or even *what* specific injury he claims. Instead, he makes a generalized allegation of unconstitutional conduct and seeks nonspecific damages flowing therefrom. This is not sufficient to establish standing to challenge the water allocations to Bryden Canyon. Where "a generalized grievance shared by all or a large class of citizens" is asserted, standing is generally denied. *See Young*, 137 Idaho at 104, 44 P.3d at 1159.

Even drawing all reasonable inferences in the record in the light most favorable to Bradbury, we must still affirm the district court's finding that Bradbury lacked standing to challenge the City's water rates and allocation to Bryden Canyon. Accordingly, the City was entitled to summary judgment as a matter of law on this claim.

5. ***The district court did not err in refusing to refund the unlawfully collected street impact fees.***

Bradbury prevailed on one of his nine claims below. The district court agreed with Bradbury that the street impact fees assessed and allocated to the water, wastewater, and sanitation funds amounted to an illegal tax. The City has not appealed that decision. However, the district court also determined that a refund of the street impact fees to all the utility ratepayers was not a remedy it could provide. Because he only sued the City as an individual, the district court only considered whether Bradbury, alone, was entitled to a refund. The district court determined that

23

Bradbury failed to file a notice of claim for damages as prescribed by the Idaho Tort Claims Act ("ITCA"), which procedurally barred him from recovery.

On appeal, Bradbury contends that the ratepayers are entitled to have the unconstitutional street impact fees refunded to them and points to the record to demonstrate that he filed a notice of claim for damages pursuant to the ITCA. The City argues that the street impact fees "were not 'excess funds' that were due to be refunded to City residents under this or any other provision of the City's code." There are several issues raised here: (a) whether Bradbury brought this lawsuit in his individual capacity, (b) whether the district court erred in determining that ITCA precludes recovery on a constitutional claim, and (c) whether Bradbury is entitled to a refund.

### a. Bradbury brought this lawsuit in his individual capacity.

The Idaho Rules of Civil Procedure require an action to "be prosecuted in the name of the real party in interest." I.R.C.P. 17(1). The Rules specify the limited circumstances where parties "may sue in their own names without joining the person for whose benefit the action is brought." *Id.* These include executors, administrators, personal representatives, guardians, bailees, trustees of an express trust, parties with whom or in whose name a contract has been made for another's benefit, and parties authorized by statute. *Id.* Additionally, Rule 77 establishes the prerequisites for bringing a class action. I.R.C.P. 77.

When Bradbury filed this action against the City on March 29, 2021, he stated that he brought the petition "in his capacity of City Councilor and in his capacity of a utility ratepayer on his own behalf and the behalf of all residents of Lewiston rate payers." However, he did not attempt to (1) join any parties to the action, (2) file his petition as a class action, or (3) ask the court "to certify the action as a class action." I.R.C.P 77(c)(1)(A). Thus, Bradbury filed this lawsuit on his own behalf and for no one else. Aside from his former position as a city council member, he has also not asserted any authority to prosecute an action on behalf of all the City's ratepayers. Nor has he established whether he meets an exception under the Idaho Rules of Civil Procedure.

We affirm the district court's conclusion that Bradbury's status as a city council member when he filed this action does not establish legislative standing or endow him special standing to bring suit against the City. Bradbury compares his case to *Bedke v. Ellsworth*, where we agreed that two legislative officers had standing to bring an "institutional injury" on behalf of the respective bodies they represented. 168 Idaho 83, 93–94, 480 P.3d 121, 131–32 (2021). In *Bedke*, the Speaker of the House of Representatives and President Pro Tempore of the Senate claimed

24

they were "unable to discharge their statutorily created responsibility to allocate space on the first floor of the Capitol because the Treasurer refuse[d] to vacate her office." *Id.* at 94, 480 P.3d at 132. Importantly, Bedke and Hill did not allege a generalized injury; they asserted "a specific and particularized grievance" concerning "a statutorily authorized duty delegated specifically to them." *Id.* The same cannot be said of Bradbury, who has brought this suit alone and "in his capacity [as] a utility ratepayer." While Bradbury was a city council member for the City at the time he filed this action, he has not alleged an institutional injury nor has he sought to validate or perform an institutional right of the city council.

Accordingly, we agree with the district court that Bradbury brought the action only in his individual capacity.

### b. The district court erred in determining that the ITCA precluded recovery on a constitutional claim seeking equitable relief.

In ruling on the motions for summary judgment, the district court concluded that there was nothing in the record "that indicate[d] Bradbury provided to the City a notice of a claim for damages," as required under the ITCA, specifically Idaho Code section 50-219. Bradbury argues that he is entitled to have his fees refunded regardless of whether he filed his notice of claim under the ITCA. Bradbury cites to *Hill-Vu Mobile Home Park v. City of Pocatello*, 162 Idaho 588, 594, 402 P.3d 1041, 1047 (2017), to argue that the unconstitutional fees must be refunded as a matter of equity. He also contends that he complied with the ITCA "in an abundance of caution" even though he did not have to. The City contends that the district court was not required to "scour the entire record" for a document Bradbury "had elsewhere offered," and that it was Bradbury's responsibility to set forth the specific facts in response to the motion for summary judgment. We conclude that the district court erred in determining that the ITCA, as a state statute, could preclude recovery on a constitutional claim. Furthermore, even if the ITCA applied, we conclude that the evidence in the record supports Bradbury's position that he complied with the statute's notice requirements.

"All claims for damages against a city must be filed as prescribed by [the ITCA]." I.C. § 50-219. Where the ITCA applies, a claim must "be presented to and filed with the clerk or secretary of the political subdivision" within 180 days "from the date the claim arose or reasonably should have been discovered, whichever is later." I.C. § 6-906. Bradbury points to a document in the record that he filed with the City in September 2020, approximately eight months prior to initiating this action in the district court. This notice of claim consists of an email in which Bradbury

25

informed the city clerk he was filing a "Notice of Claim against the City of Lewiston" out of an "abundance of caution." The draft complaint attached to this email called for declaratory relief, injunctive actions to enjoin continuation of unconstitutional practices, and sought an order for the City "to repay those utilities for the funds illegally transferred." Even the City's briefing prior to summary judgment recognized that Bradbury filed a notice of claim for damages in September 2020. Thus, the record establishes that Bradbury complied with the ITCA by timely filing his notice of claim with the city clerk.

However, even if Bradbury had failed to comply with the ITCA's notice requirements, as the district court inaccurately concluded, this would not be a bar to his constitutional claims. We agree with Bradbury's application of *Hill-Vu*, and conclude that unconstitutional fees may be refunded as a matter of equity.

In *Hill-Vu*, the City of Pocatello implemented a revenue-generating payment in lieu of increasing property taxes. 162 Idaho at 594, 402 P.3d at 1047. The plaintiffs sought a judgment to recover money unlawfully collected by the city from the users of the city's water and sewer systems. *Id.* at 590, 402 P.3d at 1043. Following cross motions for summary judgment, the district court held that all of the plaintiffs' state law claims (including their unconstitutional taking claim) were barred under the ITCA. *Id.* at 592, 402 P.3d at 1045. This Court vacated the judgment and remanded for further proceedings. *Id.* at 600, 402 P.3d at 1053. While the ITCA provided that a governmental entity cannot be liable in tort for a claim arising out of the assessment or collection of a tax, the Idaho Constitution barred a government from taking private property without just compensation. *Id.* at 594, 402 P.3d at 1047. This Court concluded that "[a] statute cannot limit the right to recover for the taking of property in violation of the Constitution." *Id. See also N. Idaho Bldg. Contractors Ass'n v. City of Hayden*, 164 Idaho 530, 542, 432 P.3d 976, 988 (2018) ("the failure to comply with notice requirements of the ITCA cannot serve as a bar for federal takings claims."). Thus, in *Hill-Vu*, the ITCA did not preclude a claim to recover unconstitutional utility charges. *Id.*

While the facts here differ slightly from *Hill-Vu*, the situation and principles are analogous. Like in *Hill-Vu*, Bradbury has brought an action to recover damages from unconstitutional utility fees imposed by the City. The district court determined that the street impact fees were an illegal tax but it barred recovery under the ITCA. Not only did Bradbury comply with the ITCA, as noted

above, he did not have to. *Hill-Vu* establishes that a state statute cannot limit a plaintiff's right to recover against a municipality's unconstitutional acts.

### c. Bradbury is not entitled to a refund or remand.

Bradbury has brought this suit in his individual capacity and he has successfully argued that (1) he was in compliance with the ITCA and (2) his recovery on a constitutional claim cannot be barred by the state statute. Yet, Bradbury has also maintained throughout this litigation that "[n]ot once is there a request for a personal remedy." By his own concession before this Court at oral argument, Bradbury stated that he is *not* seeking reimbursement for his injury. Thus, while we reverse the district court's determination that recovery was barred to Bradbury, we must also conclude that a remand to consider damages is unnecessary. There need not be an assessment of the amount of refund Bradbury is entitled to where he has repeatedly stated that he is not seeking such relief.

### C. The district court did not err in denying Bradbury's request for attorney's fees.

Bradbury next argues that the district court erred in denying his request for attorney fees. Both Bradbury and the City sought attorney fees and costs below; however, the court concluded that there was no prevailing party at summary judgment since each side had partially prevailed. In examining Bradbury's request for attorney fees, the district court also determined that his claim failed on two additional grounds. First, he could not show a legal precedent for attorney fees under the private attorney-general doctrine where he was a pro se litigant and, second, he failed to meet the requirements of Idaho Rule of Civil Procedure 54. Bradbury challenges each decision.

"Attorney fees may be awarded if authorized by statute or contract." *Stibal v. Fano*, 157 Idaho 428, 435, 337 P.3d 587, 594 (2014). "The determination of who is a prevailing party, for the purpose of receiving an award of attorney fees, is committed to the sound discretion of the trial court." *Israel v. Leachman*, 139 Idaho 24, 26, 72 P.3d 864, 866 (2003). Thus, that determination will only be disturbed upon a showing of an abuse of discretion. *Id.*; *Dickinson Frozen Foods, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 676, 434 P.3d 1275, 1282 (2019). This includes "the discretion to decline an award of attorney fees when it determines that both parties have prevailed in part." *Allen v. Campbell*, 169 Idaho 125, 130, 492 P.3d 1084, 1089 (2021). As articulated in the Idaho Rules of Civil Procedure:

> In determining which party to an action is a prevailing party and entitled to costs, the trial court must, in its sound discretion, consider the final judgment or result of the action in relation to the relief sought by the respective parties. The trial court

27

may determine that a party to an action prevailed in part and did not prevail in part, and on so finding may apportion the costs between and among the parties in a fair and equitable manner after considering all of the issues and claims involved in the action and the resulting judgment or judgments obtained.

I.R.C.P. 54(B).

Below, the district court concluded that neither Bradbury nor the City were entitled to attorney fees. Pursuant to its discretion under *Allen*, the district court concluded that both parties prevailed in part and lost in part, leading the district court to determine that there was no "overall prevailing party." Implicit in this determination is that the district court determined that the most equitable apportionment of costs and fees was to have the parties bear their own costs of litigation. While Bradbury argues that the importance of his partial victory makes him "by definition the prevailing party," we conclude that the district court exercised reason and appropriate discretion in determining that both sides had prevailed in part and that neither side was entitled to an award against the other. There was no abuse of discretion in reaching this decision.

Our decision on this issue is dispositive of Bradbury's remaining arguments on attorney fees and we need not address the applicability of the private attorney general doctrine to a pro se party. Nevertheless, even if fees could be awarded under these circumstances, Bradbury's request for fees was fatally flawed due to his failure to comply with the Idaho Rules of Civil Procedure concerning attorney fees and costs. "A claim for attorney fees as costs must be supported by an affidavit of the attorney stating the basis and method of computation." I.R.C.P. 54(e)(5). "Because attorney fees are deemed as costs and must be included in the memorandum of costs, I.R.C.P. 54(e)(5), the failure to timely file a memorandum of costs will constitute a waiver of the right to recover attorney fees." *Est. of Holland v. Metro. Prop. & Cas. Ins. Co.*, 153 Idaho 94, 102, 279 P.3d 80, 88 (2012). Additionally, "the reasonableness of the amount of attorney fees requested . . . is determined by the trial court's application of all of the factors set forth in Rule 54(e)(3)." *Bailey v. Bailey*, 153 Idaho 526, 530, 284 P.3d 970, 974 (2012).

Bradbury failed to include a memorandum of costs or any affidavit "stating the basis and method of computation." I.R.C.P. 54(e)(5). His request for attorney fees only provided the district court with general information touching on the Rule 54(e)(3) factors. For example, Bradbury asserts that he sufficiently met these procedural rules by discussing his legal experience, the difficulty of the tasks and research, the "inordinate amount of time" involved in the research, and the importance of the issues. However, he did not provide key specific details in a memorandum

28

setting forth the actual number of hours he worked on the case or its corresponding costs. He did not submit any timesheets, any data showing his expenses or charges, any reasonable costs of preparing evidence, and *he presented no claim for an actual fee for his services*. In short, while Bradbury discussed the significance of his case, he offered no evidence upon which the district court could determine a reasonable fee. By Bradbury's own admission: "[I] did not submit the hours [I] spent because [I] did not record them." Thus, he not only failed to comply with Idaho's Rules of Civil Procedure, he made it impossible for the district court to consider all of the Rule 54(e)(3) factors or calculate a reasonable attorney fee.

We conclude that the district court correctly perceived this issue as one of discretion under *Allen*, acted within those boundaries of that discretion, acted consistently with the legal standards governing attorney fees, and then reached its decision by an exercise of reason. There was no abuse of discretion in declining to award attorney fees where both parties partially prevailed in the case, particularly where Bradbury failed to comply with the Idaho Rules of Civil Procedure in making his request for attorney fees before the district court. Thus, we affirm the district court's order denying attorney fees to Bradbury and the City.

### D. The City is not entitled to attorney fees on appeal.

Both parties argue that they are entitled to an award of attorney fees on appeal. Bradbury requests attorney fees and costs "at the trial and appellate levels as a private attorney general and pursuant to I.C. §12-117." The City requests attorney fees under Idaho Code section 12-117, arguing that Bradbury advanced a "baseless, unfounded appeal."

Bradbury is not entitled to attorney fees on appeal. Not only is he not the overall prevailing party on appeal, he advances no argument as to why he should be entitled to attorney fees on appeal. He simply requests an award in the list of issues laid out in his briefing. This Court has determined that "[a] party seeking an award of attorney fees must 'support the claim with argument as well as authority.' " *Teurlings v. Larson*, 156 Idaho 65, 76, 320 P.3d 1224, 1235 (2014) (quoting *Evans v. Sayler*, 151 Idaho 223, 228, 254 P.3d 1219, 1224 (2011)). A mere citation of the basis for an award is insufficient for an award of attorney fees. *Bagley v. Thomason*, 149 Idaho 799, 805, 241 P.3d 972, 978 (2010).

Although the City is the overall prevailing party on appeal, we conclude that it is not entitled to attorney fees under Idaho Code section 12-117. That statute mandates an award of reasonable attorney fees to the prevailing party "in any proceeding involving as adverse parties a

29

state agency or a political subdivision and a person," where "it finds that the nonprevailing party acted without a reasonable basis in fact or law." I.C. § 12-117(1). Although many of Bradbury's claims on appeal were brought without a reasonable basis in fact or law, he prevailed on the claim that the district court erred in concluding his cause of action for rate refunds was barred by the ITCA. He also raised significant issues of first impression concerning whether the internal transfer of funds, characterized as "loans" by the City, runs afoul of the Idaho Constitution. We acknowledge that Bradbury undermined his own arguments at times by consistently asserting that he is seeking no damages for himself. Yet, given that his effort to act on behalf of the affected city taxpayers—albeit procedurally deficient—was grounded in the City's unusual handling of taxpayer funds, we cannot conclude his appeal qualifies for an award of attorney fees against him under section 12-117.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. First, we reverse the district court's legal conclusion that the ITCA barred Bradbury's right to an individual refund on the street impact fees because it was a constitutional claim based in equity. However, a remand is unnecessary where Bradbury concedes he is seeking no such remedy for himself. Second, we affirm the district court's rulings on all remaining issues on appeal. No attorney fees are awarded to either party; however, the City is awarded costs as a matter of course. I.A.R. 40(a).

Chief Justice BEVAN, Justices BRODY, ZAHN and Justice Pro Tem BERECZ concur.