# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket Nos. 51266 and 51616

| | | |
|---|---|---|
| ERIE PROPERTIES, LLC, a Wyoming limited liability company, | ) ) ) | |
| Plaintiff-Counterdefendant-Respondent | ) ) ) | |
| v. | ) ) | |
| GLOBAL GROWTH HOLDINGS, INC., a Delaware corporation; formerly known as "Academy Association, Inc." | ) ) ) ) ) ) | Boise, June 2025 Term  Opinion Filed: August 27, 2025  Melanie Gagnepain, Clerk |
| Defendant-Counterclaimant-Appellant, | ) ) ) | |
| and | ) ) | |
| ACADEMY ASSOCIATION, INC., a North Carolina corporation; and SPOKANE TEACHERS CREDIT UNION, a Washington credit union, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Lamont C. Berecz, District Judge.

The district court's judgment is affirmed.

Condon Tobin Sladek Thornton Nerenberg, PLLC, Dallas, TX and Parsons Behle & Latimer, Boise, attorneys for Appellant, Global Growth Holdings, Inc. Jared T.S. Pace submitted argument on the briefs.

Givens Pursley, LLP, Boise, attorneys for Respondent, Erie Properties, LLC. Morgan D. Goodin submitted argument on the briefs.

---

BEVAN, Chief Justice.

This appeal concerns the breach of a lease. Erie Properties, LLC ("Erie") leased commercial property in northern Idaho to Global Growth Holdings ("Global") for use as a corporate retreat. Erie alleged that Global failed to pay the required rent under the lease, and Erie was ultimately granted summary judgment for its damages and attorney fees. The district court dismissed Global's counterclaim for unjust enrichment relating to costs Global incurred for the construction of new buildings on Erie's property. The court also denied Global's subsequent motion for reconsideration. On appeal, Global argues that the district court erred because genuine issues of material fact precluded summary judgment on the issue of whether Erie agreed to accept payments for the construction of a residence on the property in lieu of rent payments. For the reasons below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. *The parties*

The business entities involved in this case have convoluted ties, but all of them had their genesis with a man named Greg Lindberg. Lindberg is not a party to this case, but his actions precipitated the ultimate filing of the lawsuit by Erie. Erie was incorporated on April 15, 2009. Dunhill Holdings, LLC was the sole *member* of Erie, and Lindberg was its sole *manager*. Lindberg was also the sole member and manager of Dunhill. Eli Research, Inc. (later Academy Association, Inc. ("AAI") and now Global) was originally incorporated on October 24, 1996. Lindberg was the president, sole principal officer, and sole director of Eli Research, Inc. This chart summarizes the relationship between the four entities:

**Lindberg's Relationship to Erie and Global**

2

## 2. *The Property and Lease*

In October 2014, Erie requested financing from Spokane Teachers Credit Union ("STCU") in the amount of $6,933,500 to purchase commercial real estate in Hope, Idaho, consisting of "three separate but adjacent properties that include two residential lake-side properties and a small island."

STCU initiated a third-party review of Erie's loan proposal. The report prepared by the third-party reviewer states that "[t]he properties are to be leased to Academy Association, Inc., wholly owned by Greg Lindberg, for use as a corporate retreat for clients and employees." Source of repayment of the loan would be "projected lease cash flow based on the lease agreement for the subject properties. . . . The annual lease arrangement will be $1.0 million per year with monthly payments triple net."

On November 18, 2014, Erie executed a deed of trust, with Erie as the grantor, STCU as the lender or beneficiary, and Sandpoint Title Insurance, Inc. as the trustee. On November 26, 2014, that deed of trust was recorded in Bonner County. The properties related to the deed of trust consist of the above-noted real estate in Hope, Idaho.

On November 26, 2014, Erie entered a triple net lease ("Lease") with AAI to lease the premises owned by Erie, including some of the parcels in the deed of trust discussed above. Under the Lease, AAI was to pay a base rent of $1,000,000 annually, in twelve monthly installments starting at $83,333.33. The payments were to increase 3% per year. The monthly payments were to be made "without deductions or offsets in advance during the Lease Term, on a [triple net] basis, with Lesee [sic] paying all operating expenses of the property, including real estate taxes, assessments, utilities and all other expenses." AAI was obligated to pay rent to Erie or its agent at its office in Cheyenne, Wyoming. If rent was not paid as required in the Lease, AAI was obligated to pay a penalty

> as additional rent, 5% of the outstanding base rent currently due each day the rent is late beginning on the first day of the month in which it was originally due. This additional rent shall accrue for the following twenty (20) days. The parties agree that after twenty (20) days, the Lessee agrees that the default provisions of the agreement shall be fully enforced due to Lessee's breach of Lease. Failure to pay this additional rent or late charges shall constitute a default of this Lease by Lessee.

Additionally, an assignment of rents executed between Erie and STCU was recorded in Bonner County. The assignment transferred Erie's interest in the rent payments that were the subject of the lease to STCU.

3

The Lease also included default and remedies provisions. Under those provisions, if AAI failed to comply with the Lease, Erie could terminate: "[i]n the event: (a) Lessee fails to comply with any term, provision, condition, or covenant of this Lease including the payment of all monies due . . .; Lessee shall be in default and Lessor shall have the option to do any one or more of the following: . . . Lessor may terminate this Lease . . . ."

In 2015, Erie contracted with McMahon & Easterbrook Custom Builders to construct a residence on 90 Kullyspell Drive—one of the parcels on the property at issue in this appeal. The contract is signed by Lindberg as the Chairperson for Erie. McMahon explained during a deposition that all construction invoices were sent to Erie and that from the start of construction in 2015 until sometime in 2019, he was paid by Dunhill, the LLC that owned and controlled Erie. In total, Dunhill paid McMahon approximately $8,838,467.58 in construction costs, $8,350,624.17 of which were made by Dunhill on behalf of Erie.

During the Lease term, and consistent with the provisions of the Assignment, it appeared that AAI made some monthly rent payments directly to STCU on the loan that was secured by the deed of trust. However, these payments were generally in the amount of $34,060.67,[1] which was much less than the required base rent listed above.

On December 31, 2018, Lindberg and several of his entities, including Dunhill, PBX Holdings, LLC, PBX Bermuda Holdings, Ltd., Private Bankers Life and Annuity, Ltd. ("PBLA"), entered into a Membership Interest Contribution Agreement with PBLA ULICO 2017[2] wherein, through various transfers, Dunhill transferred 100% of its membership interests in Erie to PBLA ULICO 2017. Lindberg signed on behalf of Dunhill, PBX Holdings, PBX Bermuda Holdings, and PBLA, and BNY Mellon signed as Trustee of PBLA ULICO 2017. That same day, PBLA ULICO 2017 (the new sole member of Erie) and Lindberg executed the First Amended and Restated Operating Agreement of Erie Properties, LLC, which appointed Lindberg as the sole manager of Erie.

On March 30, 2020, AAI and Global filed Articles of Conversion to a Foreign Entity with the North Carolina Secretary of State. Those Articles provided that AAI was being converted into a Delaware corporation, Global Growth Holdings, Inc., and the mailing address was changed

---

[1] In 2020, AAI/Global increased its monthly rent payments to $36,039.54.

[2] "ULICO" means Universal life Insurance Company of Puerto Rico.

accordingly. The Lease was not amended to reflect that change but Global, as the successor to AAI, assumed the obligations of the Lease.

On September 25, 2020, the Supreme Court of Bermuda entered an order appointing Rachelle Frisby and John Johnston of Deloitte, Ltd., to be the Joint Provisional Liquidators ("JPLs") of PBLA. Pursuant to the Supreme Court of Bermuda's order, the JPLs had the power to "investigate the assets and affairs of the Company," "surrender any lease or tenancy of any of the property of the Company," and "as the grantors of PBLA ULICO 2017, instruct the trustee of ULICO to terminate Lindberg as the manager of Erie."

In August 2021, PBLA ULICO 2017 approved the appointment of Frisby as the Investment Manager and Johnston as the Manager of Erie. On November 22, 2021, Lindberg was formally removed as manager of Erie and Johnston was appointed as the new manager. Around the same time, while implementing their court-ordered duties, the JPLs learned that the Lease that forms the basis of this appeal existed between Erie and AAI. On January 6, 2022, Erie, through the JPLs, terminated the Lease.

*3. Procedural History.*

To collect the amount due under the contract, Erie filed a lawsuit against Global and STCU, asserting four causes of action. Under Count I, Erie requested a declaratory judgment declaring Global has no lease interest; Count II requested a declaratory judgment declaring STCU's interest to be limited to the deed of trust; Count III sought to quiet title against all defendants; and Count IV asserted breach of lease against Global. Judgment on the first three Counts was eventually granted by the district court after Erie moved for summary judgment.

Thereafter, Global moved to amend its answer to assert a claim for unjust enrichment, which the district court granted. Erie then moved for summary judgment again on its remaining claim for breach of contract and to dismiss Global's counterclaim for unjust enrichment. Opposing Erie's motion, Global argued that it had not defaulted on the Lease because it paid $10.8 million toward rent obligations, and it was not required to pay rent after the first month because Erie failed to deliver a corporate retreat to Global.

The district court rejected Global's arguments and agreed with Erie that Global breached the Lease by failing to make full rent payments due under the Lease. The district court also rejected Global's argument that it was never obligated to pay rent because Erie failed to provide it with a retreat center. The district court found that the Lease contained no such requirement. The district

court also dismissed Global's claim that it paid over $10.8 million during the Lease towards the construction of new residence on the property, for which it should receive credit towards the outstanding rent obligations. The district court concluded that Global provided no evidence to support its claim that the payments towards construction costs were intended to substitute for rent payments. And even if Global had offered some facts in support of that theory, under the Lease, any improvements to the Property, including the addition of any buildings, became part of the Property and belonged to Erie. The district court then addressed Global's equitable defenses, which included waiver, quasi-estoppel, and laches. The district court agreed with Erie that every equitable defense asserted by Global was factually inapplicable. Ultimately, the district court concluded that Erie was entitled to summary judgment on its claim for breach of lease, Count IV.

The district court next addressed Global's counterclaim for unjust enrichment. Global argued that, since the inception of the Lease, it had paid more than $10.8 million towards improvements to the Property, including payments for construction, maintenance, management, and the mortgage on the Property. All these payments were for Erie's benefit. Global argued that Erie has been unjustly enriched by accepting these benefits and that it would be inequitable, unjust, and against good conscience to allow Erie to retain those benefits without compensating Global.

Erie argued that Global's counterclaim failed to state a claim because Global was obligated under the terms of the Lease to tender all the payments it allegedly made regarding the Property. Erie also argued that there was no genuine dispute that the Lease, now terminated, was once an enforceable, express contract between the parties and therefore a written contract addressed Global's payments concerning the property, thereby precluding its counterclaim. Erie asserted that the costs associated with construction of the residence on the Property were paid by Dunhill, an affiliate of Erie, to the construction company, McMahon. Erie argued further that Global presented no evidence showing Global funded Dunhill to make these payments on Erie's behalf or of any arrangement between Global, AAI, Erie, and/or Dunhill, whereby the parties agreed that Global would fund Dunhill to make payments to McMahon on Erie's behalf and in lieu of rent.

The district court agreed with Erie, finding that, under the triple net provision in the Lease, Global was responsible for payment of the utilities, taxes, and improvements on the Property in addition to the monthly rent. The district court explained that Global could not be unjustly enriched from payments that the Lease required Global to make. And the district court concluded that any payments made by Dunhill towards Erie's debts did not affect the terms of the Lease and would

6

not be credited to Global. The district court also concluded that, even if such payments were credited to AAI/Global, the payments made regarding construction for the residence would have been AAI/Global's sole responsibility and the residence would become Erie's property at the expiration of the Lease pursuant to its terms. Thus, the district court dismissed Global's counterclaim for unjust enrichment.

On June 16, 2023, the district court entered judgment for Erie on Count IV, awarding Erie a total of $14,492,851.82 in damages, and dismissing Global's counterclaim for unjust enrichment with prejudice. That same day, Global filed a motion for reconsideration of the district court's decision on summary judgment. On reconsideration, Global argued that the district court erred in not crediting it for the payments made by Dunhill to McMahon for the construction of the residence on the Property. According to Global, the district court erred in its finding that there was "no evidence" to support Global's argument that it funded Dunhill, an alleged affiliate, to make payments to McMahon for the construction of the residence and allegedly on behalf of Erie and in lieu of rent under some arrangement. Global also argued that the district court should have credited Global for the McMahon payments because Erie credited Global for the STCU mortgage payments on the Property that were also made by Dunhill.

In opposition, Erie argued (1) there was no evidence that Global funded Dunhill to make payments to McMahon for the construction of the residence on Erie's behalf; and (2) Erie's decision to credit Global for the mortgage payments did not support the district court also crediting Global for the Dunhill/McMahon payments. Finally, Erie argued no evidence supported Global's equitable defenses for laches, quasi-estoppel, or waiver.

The district court agreed with Erie and denied the motion for reconsideration from the bench during oral argument. The district court ultimately entered an amended final judgment, which included Erie's requested attorney's fees and costs. On October 2, 2023, the district court entered a second amended final judgment to correct a clerical error in the first amended final judgment. Global appealed.

## II.  ISSUES ON APPEAL

1.  Whether the district court erred by granting summary judgment for Erie on its breach of lease claim?

2.  Is Erie entitled to attorney fees and costs below?

3.  Is either party entitled to attorney fees and costs on appeal?

7

### III. STANDARDS OF REVIEW

"This Court employs the same standard as the district court when reviewing rulings on summary judgment motions." *Owen v. Smith*, 168 Idaho 633, 640, 485 P.3d 129, 136 (2021) (quoting *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 140, 456 P.3d 201, 209 (2019)). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting I.R.C.P. 56(a)). "A moving party must support its assertion by citing particular materials in the record or by showing the 'materials cited do not establish the ... presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s].'" *Id*. (quoting I.R.C.P. 56(c)(1)(B)). "Summary judgment is improper 'if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented.'" *Id*. at 641, 485 P.3d at 137 (quoting *Trumble*, 166 Idaho at 141, 456 P.3d at 210). A "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Id*.

*Barton v. Bd. of Regents of Univ. of Idaho*, 173 Idaho 885, 892, 550 P.3d 293, 300 (2024).

"This Court reviews a trial court's decision to grant or deny a motion for reconsideration using the same standard of review as the lower court in ruling on the motion." *Ciccarello v. Davies*, 166 Idaho 153, 159, 456 P.3d 519, 525 (2019) (citing *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012)). In other words:

If the decision was within the trial court's discretion, we apply an abuse of discretion standard. On the other hand, when reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment.

*Id.*

### IV. ANALYSIS

**A. The district court did not err in granting Erie summary judgment.**

To establish a breach of contract claim, a party must show "(1) the existence of the contract, (2) the breach of the contract, (3) the breach caused damages, and (4) the amount of those damages." *McCarthy Corp v. Stark Inv. Grp., LLC*, 168 Idaho 896, 904, 489 P.3d 804, 815 (2021) (internal quotation marks omitted). When interpreting the terms of a contract, such as a lease, the court's objective is to discern the parties' mutual intent at the time they entered the contract. *Stanger v. Walker Land & Cattle, LLC*, 169 Idaho 566, 573, 498 P.3d 1195, 1202 (2021). If the contract terms are unambiguous, the court can determine the intent by looking at the four corners of the document. *Id.* However, if the contract is "reasonably subject to conflicting interpretation[s]," the contract is ambiguous, and factual determinations must be made. *Id.*

8

Notably, "the court gives force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they actually intended for it to mean." *Id.* (quoting *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006)) (internal quotation marks omitted).

      1. *It was permissible for the district court, as the trier of fact, to resolve any conflicting inferences based on undisputed facts.*

On summary judgment below, the district court supported its conclusion by citing case law for the proposition that, when the facts are not in dispute, and when a trial court alone will be responsible for resolving conflicting inferences, the trial court may appropriately resolve those conflicts. Among the cases that the district court cited for that statement of law were *State of Idaho, Dep't of Fin. v. Resource Service Co.*, 130 Idaho 877, 880–81, 950 P.2d 249, 252–53 (1997), and *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 519, 650 P.2d 657, 661 (1982). According to Global, the district court's reliance on these cases, particularly *Riverside*, was error because the district court did not explain how *Riverside* supported its analysis. Global's argument is misplaced.

In reviewing summary judgment decisions, this Court has held that "[g]enerally, the trial court is not permitted to weigh the evidence or resolve controverted factual issues when ruling on a motion for summary judgment." *Nelsen v. Nelsen*, 170 Idaho 102, 121, 508 P.3d 301, 320 (2022) (quoting *AID Ins. Co. v. Armstrong*, 119 Idaho 897, 900, 811 P.2d 507, 510 (Ct. App. 1991)). "Therefore . . . even when there are no genuine issues of material fact between the parties[,] '[a] motion for summary judgment must be denied if the evidence is such that conflicting inferences can be drawn therefrom and if reasonable [jurors] might reach different conclusions.'" *Id.* (quoting *Riverside Dev. Co.*, 103 Idaho at 519, 650 P.2d at 661). "Such a rule is proper," this Court has explained, "where the matter is to be tried to a jury, because even though evidentiary facts may be undisputed, those evidentiary facts may yield conflicting inferences as to what the ultimate facts of a case are." *Id.* "If such conflicting inferences are possible, then summary judgment should not be granted as it would deprive the parties of the right to have the jury weigh the conflicting facts and make the decision." *Id.* "However, where the facts are not disputed and the trial court, rather than a jury, will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will have to resolve the conflict between those inferences." *Id.*

Here, the district court was to be the trier of fact because no jury trial was demanded by either side. As the trier of fact, the court determines whether the evidence supported the inferences needed to find that Global breached the lease and whether Erie's claim was barred by Global's affirmative defenses. We have reiterated the holding from *Riverside* and upheld it recently. *See*, *e.g.*, *Nelsen*, 170 Idaho at 120, 508 P.3d at 319. *Riverside* is still good law. The district court's citation to and application of *Riverside* was, therefore, proper because the district court, as the trier of fact, was responsible for resolving any conflicting inferences at trial. *See id.* at 122, 508 P.3d at 321.

2. *The district court did not err in granting summary judgment to Erie on its breach of lease claim for Global's failure to pay the amounts due under the lease.*

In its motion for summary judgment on the remaining claim for breach of lease, Erie argued that Global breached the Lease by failing to make full rent payments. Under the Lease, Global was obligated to pay a base rent of $1,000,000 annually "in monthly installments . . . with Lesee [sic] paying all operating expenses of the property, including real estate taxes, assessments, utilities and all other expenses." As part of the lease, the base rent increased by 3% annually. If Global failed to pay rent in full each month, Global was obligated to pay "as additional rent, 5% of the outstanding base rent currently due each day the rent is late beginning on the first day of the month in which it was originally due . . . for the following twenty (20) days." If Global fell more than twenty days behind on the rent, the default and remedies provisions of the Lease came into effect. Under those provisions, "[i]n the event: (a) Lessee fails to comply with any term, provision, condition, or covenant of this Lease including the payment of all monies due, . . . Lessee shall be in default and Lessor shall have the option to . . . terminate this Lease . . . ."

In its opposition to summary judgment, Global did not dispute that it failed to make its required monthly rent payments, but Global argued that there was a genuine issue of material fact whether failing to make those payments constituted a default under the Lease that entitled Erie to terminate the lease. This is because Global had allegedly paid over $10.8 million towards rent obligations when only $7.2 million was due. Global also claimed it was not required to pay any rent after the first month because Erie failed to deliver a corporate retreat to Global.

The district court rejected Global's argument, finding no provision in the Lease that required Erie to provide a corporate retreat for Global:

The only mention of a retreat center is regarding AAI/Global's contractual obligation which limited AAI/Global's use of the property. What the lease states is

10

AAI/Global is to use the property only as a Corporate Retreat. Verified Compl., Ex. C at 1¶ 6. Even AAI/Global's counsel admitted, at the hearing on this motion, that the lease does not contain language requiring Erie to construct a corporate retreat. Finally, even if it had been some unstated understanding (which, of course, would be unenforceable in light of the complete written contract) AAI/Global acknowledged in writing that: "All obligations of Landlord have been fully performed." Verified Compl., Ex E at 2. There is simply no merit in the argument that AAI/Global was excused from paying rent.

The district court also found that Global failed to put evidence into the record supporting its contention that it should receive credit for outstanding rental obligations for the $10.8 million it paid during the lease:

> AAI/Global argues that it paid over $10.8 million during the time of the lease and that AAI/Global should receive credit for that amount towards its rent obligations. AAI/Global calculates this amount by looking to $8,350,624.17 which was paid by a third Lindberg entity, Dunhill Holdings, LLC, to a contractor, McMahon, who was building/remodeling residences on the properties. That Dunhill Holdings, LLC paid McMahon for the construction of the residence on the property is not disputed. But AAI/Global presented no evidence to support its claims that AAI/Global provided the funds to Dunhill that Dunhill paid to McMahon. Likewise, AAI/Global provided no evidence of any alleged agreement that the payments from Dunhill on Erie's behalf to McMahon were actually from AAI/Global and would be accepted by Erie in lieu of rent for the property.

Ultimately, the district court found that because Global had defaulted on the Lease, Erie was entitled to terminate it. As a result, the district court awarded Erie $12,925,786.03 in unpaid rent, interest due on unpaid rent, late fees, and interest due on late fees after subtracting payments made towards the mortgage and a $500,000 security deposit.

On appeal, Global argues the district court erred in granting summary judgment to Erie by failing to credit Global for the payments made by Dunhill, an alleged affiliate of Global, to McMahon for the construction of the residence on the Property.

a. The district court did not err in declining to credit Global for payments made by Dunhill to McMahon.

The district court found that Global "presented no evidence to support its claim that AAI/Global provided the funds to Dunhill that Dunhill paid to McMahon." Specifically, the district court made the following findings:

> Dunhill was another Lindberg property in which Lindberg was the Chairman and in which Dunhill retained 100% of the membership interests of Erie and 100% of the managerial duties for Erie. So while Lindberg through Erie and/or Dunhill paid a contractor for building projects on the Erie properties, AAI/Global would have

11

this Court credit those payments as being rent payments from AAI/Global to Erie. AAI/Global approaches this issue with the proposition that if it says it enough times, then it must be true. Thus, AAI/Global repeatedly references that there must have been an agreement for AAI/Global to fund the Dunhill payments in lieu of rent and that it would be logical to do so. Yet the record is bereft of any facts supporting such an agreement. Moreover, while AAI/Global claims it would be logical to credit Dunhill's payments to McMahon as rent payments from AAI/Global to Erie, the [c]ourt does not follow the logic of this argument. It would appear far more logical that Erie, through Dunhill, which controlled Erie (and both were controlled by Lindberg) paid McMahon for work done on Erie's properties. The [c]ourt recognizes that all three companies were Lindberg entities; nonetheless, Dunhill and Erie were affiliated via membership interest and control while AAI/Global stood apart as a separate company with no corporate or business affiliation with Erie. So while it is logical that Dunhill would pay Erie's construction bills, it would be wholly inappropriate to credit such payments as rent from AAI/Global.

Global points to eight reasons that the district court erred in declining to credit Global for the payments made by Dunhill to McMahon for the construction of the residence: (1) Global and Erie were affiliates; (2) the parties' conduct raises at least a fact issue about whether they intended to treat Global's payments as rent substitutes; (3) there is no evidence the parties agreed that Global's payments were a loan or equity; (4) the Lease did not obligate Global to pay for Erie's new building; (5) the district court misclassified the McMahon payments as operating expenses for Global to pay; (6) the STCU mortgage payments should be treated similarly to the McMahon payments; (7) all Dunhill disbursements came from Global; and (8) Dunhill was not a party to the lease, mortgage, or McMahon contract. We will discuss each contention in turn.

i. There was no affiliate relationship between Global and Erie.

Global argues that it and Erie were affiliates as a matter of law, and the district court failed to appreciate "the economic realities flowing from those business relationships." Specifically, Global maintains that because Lindberg controlled Global, Erie, and Dunhill, Erie and Global were sister-company affiliates. As a result, Global argues that Lindberg could "reasonably accept Global's McMahon payment in lieu of rent while Erie's new retreat was being built." The district court, according to Global, erred by treating the entities as unrelated. Despite Global's argument on appeal that the affiliation between the companies meant that Lindberg could accept Global's McMahon payments in lieu of rent, Global does not point to any evidence in the record that was submitted below to show a genuine issue of material fact that there *was* an affiliation between Global and Dunhill or Global and Erie. It appears undisputed that Lindberg owned Global, Erie,

12

and Dunhill. Indeed, the district court "recognize[d] that all three companies were Lindberg entities." Even so, the district court found that "Dunhill and Erie were affiliated via membership interest and control *while AAI/Global stood apart as a separate company with no corporate or business affiliation with Erie*." (Emphasis added). There was no evidence in the record below to show that Global had a relationship with Dunhill, other than Lindberg overseeing both. And on appeal, Global does not point to anywhere in the record to show that evidence was admitted on this point that could create a genuine issue of material fact. Without more, we hold that the district court properly concluded that Global and Erie were not affiliates.

ii. <u>There is no issue of fact about whether Erie intended to treat Global's payments as rent substitutes.</u>

Global next argues that it and Erie intended to treat the $8.8 million McMahon payment as rent substitutes. The district court rejected this argument below, finding it was "far more logical that Erie, through Dunhill, which controlled Erie (and both were controlled by Lindberg) paid McMahon for work done on Erie's properties." Thus, "while it is logical that Dunhill would pay Erie's construction bills, it would be wholly inappropriate to credit such payments as rent from AAI/Global." What was more logical, according to the district court, was that "in shuttling his money (or money taken or borrowed from investors) between these three companies Lindberg did not really care that AAI/Global was not making full rent payments."

In support of its argument on appeal, Global points to five reasons that Erie intended to treat the $8.8 million McMahon payments as rent substitutes: (1) the loan and lease documents show the parties' and STCU's agreement that Global's rent payments would fund the mortgage and new replacement building construction costs; (2) had Global not paid McMahon, STCU could have foreclosed; (3) it is logical that Erie would treat the McMahon payments as rent while the new retreat was under construction because Erie rendered the property unsuitable for a retreat by removing two existing structures and allowing McMahon to use the third for a construction office; (4) the Lease did not require Global to pay for new buildings Erie contracted for; and (5) the district court erroneously equated new building construction costs with normal operating expenses. Global maintains that it only needed to create "a reasonable inference" to defeat Erie's summary judgment claims, which it claims that these five points do.

Although this Court "draw[s] all reasonable inferences in the record[ ] in the light most favorable to the party opposing the motion" for summary judgment, *Bradbury v. City of Lewiston*,

13

172 Idaho 393, 402, 533 P.3d 606, 615 (2023), those inferences must stem from evidence in the record. Each of Global's arguments invited the district court, and now this Court, to make inferences in its favor, but it fails to point to any evidence in the record that would allow this Court to draw such inferences. "In order to create a genuine issue of material fact, the party opposing the motion must present more than a conclusory assertion that an issue of fact exists. Rather, 'the plaintiff must respond to the summary judgment motion with specific facts showing there is a genuine issue for trial.'" *Jensen v. Am. Suzuki Motor Corp.*, 136 Idaho 460, 463, 35 P.3d 776, 779 (2001) (quoting *Allstate Ins. Co. v. Mocaby*, 133 Idaho 596–97, 990 P.2d 1204, 1207–08 (1999)).

While Global does provide several citations to documents in the record, it does so without any argument to explain what information this Court, or the district court below, is to glean from the evidence. For example, to support its argument that STCU could have foreclosed on Global had it not paid McMahon, Global cites the deed of trust and assignment of rents. However, there do not appear to be provisions in either document to support the inference that "Global was incentivized to pay McMahon's bills and STCU and Erie were incentivized to accept those payments as rent." Instead, Global makes conclusory statements with vague references to documents in the record, on the assumption that the district court should have, and this Court will, cobble together an argument sufficient to defeat Erie's motion for summary judgment on its behalf. That is simply not the standard. *See Cole v. Idaho Pub. Utilities Comm'n*, ___ Idaho ___, ___, 565 P.3d 815, 819 (2025) (quoting *Dickenson v. Beneway Cnty. Sheriff*, 172 Idaho 144, 150, 530 P.3d 691, 697 (2023)) ("It is not the role of this Court to search the record on appeal for citation or argument."). As such, Global has failed to establish an issue of fact that precludes summary judgment.

> iii. Global failed to point to evidence in the record showing the payments it made were for rent.

Global next argues that there is no evidence that it provided the money as a loan, pointing out that there is no promissory note or loan agreement between Global and any other entity. Global also maintains that there is no evidence (1) Global provided the money to Dunhill "to inject more Dunhill equity in Erie;" (2) "Global obtained equity in Dunhill or Erie as a result;" or (3) "Global gifted money to Dunhill or McMahon for nothing in return."

As the non-moving party on summary judgment, Global had to do more than point out that there was no evidence the parties agreed its payments were a loan or equity. As the non-moving

14

party responding to a motion for summary judgment, where Erie established there was no genuine issue of material fact that Global failed to make the full lease payments, Global "cannot merely rely upon [its] pleadings, but must produce affidavits, depositions, or other evidence establishing an issue of material fact." *Dickenson*, 172 Idaho at 152, 530 P.3d at 699 (quoting *Holdaway v. Broulim's Supermarket*, 158 Idaho 606, 611, 349 P.3d 1197, 1202 (2015)). Global could have accomplished this by submitting evidence in the record, such as an affidavit or other sworn statement, demonstrating that Global's payments were intended to be for rent. But this section of Global's brief is unsupported by any evidence in the record. There was no evidence submitted in opposition to Erie's motion for summary judgment that demonstrates a genuine issue of material fact concerning the payments Global made. As a result, Global has failed to establish a genuine issue of fact that precludes summary judgment.

        iv.  <u>There are no genuine issues of material fact about whether Global was obligated to pay for construction of a new building.</u>

Next, Global argues that an issue of fact remains about whether Erie or Global chose to build new residences. Global argues that "the lease provided that Erie could contract for capital improvements in its own name and arrange financing for them," "only Erie contracted with McMahon to build the new retreat," "Global is not a party to that contract," and "the lease itself shows it was Erie's choice to exercise its right to contract for the new buildings." Erie does not dispute these arguments. Indeed, the parties agree that there were no terms in the Lease obligating Global to pay the debts that Erie incurred under the McMahon contract for the construction of the residences. The district court likewise acknowledged that "while it is logical that Dunhill would pay Erie's construction bills, it would be wholly inappropriate to credit such payments as rent from AAI/Global." Nothing in Global's argument on appeal raises a genuine issue of material fact that Erie accepted Global's lease payments as rent substitutes.

        v.  <u>The McMahon payments were not misclassified as operating expenses.</u>

Global argues that the district court erred by concluding that the McMahon payments were typical operating expenses that the Lease obligated Global to pay. Global maintains that, although the Lease required it to pay operating expenses, the Lease did not obligate Global to pay for new building construction costs. Global's argument is misplaced.

The district court did not attribute the McMahon payments to operating expenses:

> It is true that AAI/Global paid additional expenses over the years it occupied the property that were not credited as rent payments. But this is the result of following

15

the unambiguous terms of the lease. As a triple net lease, AAI/Global was obligated to pay "all operating expenses of the property, including real estate taxes, assessments, utilities and all other expenses." It is reiterated throughout the lease that AAI/Global is responsible for expenses associated with the property "including taxes, insurance, utility charges, contract charges, maintenance of the buildings, property management and maintenance charges." Those payments are in addition to the rent. Accordingly, AAI/Global's additional payments simply cannot be counted as rent paid because the lease required AAI/Global to cover those expenses separately. The record clearly demonstrates AAI/Global paid less than the obligated base rent, and thus defaulted under the lease.

This argument from Global appears to stem from a misunderstanding of the district court's analysis. The operating expenses the district court referred to were utility and maintenance payments made by Global directly throughout the Lease term, which were included in Global's $10.8 million number it sought credit for as rent payments. The district court explained that "[i]t is true that AAI/Global paid additional expenses over the years it occupied the property that were not credited as rent payments." That said, those expenses—$931,757.88—consisted of payments that were expressly addressed and required under the triple net Lease. Specifically, the Lease provides that "Lessee shall generally be required to list in its own name all utilities, including water, gas, electricity, telephone, cable access, sewage, trash service, and any other utilities at the Premises," "Lessee shall pay Lessor, Lessee's share of all taxes or special assessments," "Lessee, at Lessee's expense, shall maintain (i) property insurance . . . [and] (ii) Commercial General Liability Coverage," and "Lessee shall be responsible for all maintenance expenses [to] maintain the property in good condition," Accordingly, under the Lease, Global was required to pay these expenses in addition to its rent obligations. As a result, we hold that the district court did not misclassify the McMahon payments as operating expenses.

### vi. The STCU mortgage payments should not have been treated like the McMahon payments

Global argues that the district court should have credited it for the McMahon payments because Erie allegedly credited it for the mortgage payments made by Dunhill to STCU and Erie "agrees it was logical to treat [Dunhill's] mortgage payment funding as rent because those payments related to the lease." In support, Global points to a finding that the district court made below: "Global made monthly rent payments of at least $34,060.67[.]" Those payments, according to Global, were the STCU mortgage payments that Global funded through Dunhill. "If it is logical

16

to treat Global's mortgage payments as rent substitutes, it is equally logical to treat Global's McMahon payments . . . in the same manner." This argument is flawed for two reasons.

First, the district court did not address the STCU mortgage payments. As referenced above, Global relies on a finding the district court made: "AAI/Global made monthly rent payments of at least $34,060.67[.]" However, Global misconstrues the district court's findings. The district court did not find that the $34,060.67 in monthly rent payments were the STCU mortgage payments. Instead, the district court found:

> AAI/Global made monthly rent payments of $34,060,676, which is notably less than the required base rent listed above. There is no genuine issue of material fact regarding whether AAI/Global paid rent in full. It did not. AAI/Global presents several creative arguments to claim that it does not owe the rent sought by Erie. These arguments are unavailing . . . .

Even setting aside whether the district court attributed rent to the STCU mortgage payments, it remains unclear how such a finding would then translate to a credit for the Dunhill-McMahon construction payments. The logic connecting the two is absent on the record before us.

The district court rejected Global's invitation to credit it for the Dunhill/McMahon construction payments:

> Moreover, while AAI/Global claims it would be logical to credit Dunhill's payments to McMahon as rent payments from AAI/Global to Erie, the Court does not follow the logic of this argument. It would appear far more logical that Erie, through Dunhill, which controlled Erie (and both were controlled by Lindberg) paid McMahon for work done on Erie's properties. The Court recognizes that all three companies were Lindberg entities; nonetheless, Dunhill and Erie were affiliated via membership interest and control while AAI/Global stood apart as a separate company with no corporate or business affiliation with Erie. So while it is logical that Dunhill would pay Erie's construction bills, it would be wholly inappropriate to credit such payments as rent from AAI/Global.

Global's argument on appeal that the STCU mortgage payments should be treated similarly to the McMahon payments does not reflect the district court's findings, nor is the argument a reasonable inference this Court can draw from the district court's findings. As such, Global failed to establish a genuine issue of material fact.

> vii. There is no genuine issue of material fact about whether Global provided funds to Dunhill that Dunhill paid to McMahon.

Global challenges the district court's finding that it "presented no evidence to support its claim that AAI/Global provided the funds to Dunhill that Dunhill paid to McMahon." According to Global, that conclusion is incorrect because its witness, Sandi White, testified that Global

17

provided the funds that Dunhill disbursed to McMahon. Specifically, Global argues that White testified that "Global indirectly paid the McMahon costs for Erie because Dunhill got its money from Global; that is, Lindberg funded Dunhill from Global." Erie redirects this Court to Global's failure to produce any evidence of how Dunhill was funded, including evidence that Global funded Dunhill.

The district court found below:

That Dunhill Holdings, LLC paid McMahon for the construction of the residence on the property is not disputed. But AAI/Global presented no evidence to support its claims that AAI/Global provided the funds to Dunhill that Dunhill paid to McMahon. Likewise, AAI/Global provided no evidence of any alleged agreement that the payments from Dunhill on Erie's behalf to McMahon were actually from AAI/Global and would be accepted by Erie in lieu of rent for the property.

Global's argument stems from testimony that White gave during her deposition, stating "Dunhill Holdings got its money from AAI." Later in her deposition, however, White admitted that she did not know how Dunhill was funded. Specifically, in response to Erie's counsel's statement, "you don't know what [Lindberg's] sources of funding for Dunhill Holdings, LLC might have been," White responded, "Correct." She was also asked whether she knew if "every single dollar that Dunhill Holdings got during this time period from 2014 to 2019 came from AAI," to which she responded, "I don't know." When White testified that payments were made from AAI to Dunhill, and then from Dunhill to McMahon, she was asked whether she produced any records "that show said funding of Dunhill by Academy Association, Inc. in order to pay on to Erie Properties." White stated that she did not but that they "probably" exist. White was then asked to give those documents to her counsel so they could be produced in discovery, which both White and her counsel agreed to do. Those documents, if they were ever produced, are not in the record.

Global maintains that because "those McMahon payments were not funded through Dunhill, it can be reasonably inferred that, for consistency, Global's indirect McMahon payments were disbursed through Dunhill as a paying agent." Global's argument, like the other arguments it advances, conflates reasonable inferences with assumptions. While this Court may make reasonable inferences from the uncontested evidence presented to it, no evidence supports Global's claims. *Bradbury v. City of Lewiston*, 172 Idaho 393, 402, 533 P.3d 606, 615 (2023). Instead, Global asks this Court to assume that the absence of evidence that Dunhill's money came from a source other than Global means that Dunhill's money came from Global. Nothing in the record would warrant such an assumption. As such, the district court's finding that Global "presented no

18

evidence to support its claim that AAI/Global provided the funds to Dunhill that Dunhill paid to McMahon" was proper.

viii. There is no genuine issue of material fact about whether Dunhill was a party to the lease, mortgage, or McMahon contract.

Finally, Global argues that "Dunhill was not a party to the lease, mortgage, or McMahon contract; thus, it had no legal obligation to any party in this case. Conversely, Global was a party to the lease and Erie was the McMahon contract counterparty and the STCU primary debtor." As a result, Global claims it is "logical that Global would make rent payments used to pay the mortgage and McMahon." This argument is advanced without a single citation to the record. Global does not allege a material issue of fact; instead, it again invites this Court to make the *factual* finding "that Global would make rent payments used [sic] to pay the mortgage and McMahon." We decline to do so.

3. *There were no issues of fact regarding an implied-in-fact or implied-in-law agreement between Global and Erie.*

Next, Global maintains that it raised "at least a fact issue" regarding whether Global and Erie made a separate implied-in-fact agreement in which Erie would accept Global's STCU and McMahon payments in lieu of rent. Global argues that, in addition to the Lease, "the evidence shows that the parties also created an additional implied in fact or implied in law contract regarding their agreement that Global would pay old Erie's mortgage and McMahon debts, neither of which Global was obligated to pay, in lieu of paying rent otherwise due under the lease." As such, Global argues that the district court erred in not finding an implied-in-fact or implied-in-law agreement between the parties.

Erie challenges Global's assertion that the district court erred, noting that the district court could not have erred in finding an implied agreement because Global never argued below that an implied agreement governed the parties' conduct. As such, Erie encourages this Court to decline to consider Global's argument on appeal. Global does not respond to this argument in its reply brief.

It is well-established in Idaho that "[i]ssues not raised below will not be considered by this court on appeal, and the parties will be held to the theory upon which the case was presented to the lower court." *State v. Gonzales*, 165 Idaho 667, 672, 450 P.3d 315, 320 (2019) (quoting *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017)). "This Court has made clear that a central rule of appellate review is that '[t]his Court will not consider issues raised for the

19

first time on appeal.'" *State v. Hoskins*, 165 Idaho 217, 221–22, 443 P.3d 231, 235–36 (2019) (quoting *Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704). Thus, "[t]o properly preserve an issue for appellate review, 'both the issue and the party's position on the issue must be raised before the trial court. . . .' " *Id.* (quoting *Gonzales*, 165 Idaho at 99, 439 P.3d at 1271); *see also Garner v. Bartschi*, 139 Idaho 430, 436, 80 P.3d 1031, 1037 (2003) ("To properly raise an issue on appeal there must either be an adverse ruling by the court below or the issue must have been raised in the court below, an issue cannot be raised for the first time on appeal.") (quoting *McPheters v. Maile*, 138 Idaho 391, 397, 64 P.3d 317, 323 (2003)).

Global argues for the first time on appeal that a contract implied in law or in fact existed between the parties. Since this argument was not advanced below, we cannot conclude that the district court erred in failing to consider an argument that was not presented to it. Accordingly, we decline to address Global's argument as it pertains to an implied-in-law or implied-in-fact contract.

      *4.   The district court did not err in finding Global failed to support its affirmative defenses.*

         a.  Quasi-estoppel

"Quasi-estoppel prevents a party from changing its legal position and, as a result, gaining an unconscionable advantage or imposing an unconscionable disadvantage over another." *Hollingsworth v. Thompson*, 168 Idaho 13, 22–23, 478 P.3d 312, 321–22 (2020) (citing *Garner v. Bartschi,* 139 Idaho 430, 437, 80 P.3d 1031, 1038 (2003)). "Unlike equitable estoppel, quasi-estoppel does not require an undiscoverable falsehood, and it requires neither misrepresentation by one party nor reliance by the other." *Id.* at 23, 478 P.3d at 322. Instead, quasi-estoppel applies when:

> (1) the offending party took a different position than his or her original position and (2) either (a) the offending party gained an advantage or caused a disadvantage to the other party; (b) the other party was induced to change positions; or (c) it would be unconscionable to permit the offending party to maintain an inconsistent position from one he or she has already derived a benefit or acquiesced in.

*Id.* (quoting *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho,* 166 Idaho 132, 136, 456 P.3d 201, 215 (2019)).

Global argues "there is at least a fact issue regarding whether Erie is equitably estopped to deny it accepted the benefit of more than $8,838,467.59 million in payments Global paid to construct replacement buildings on Erie's land." Specifically, Global argues that Erie acquiesced to Global paying Erie's STCU debt and the McMahon debt in lieu of direct rent payments. Erie

20

responds that it is undisputed that it contracted with McMahon for the construction of the residence on the Property and that Dunhill made the payments associated with the construction. Section 17 of the Lease states: "Any alteration, physical additions or improvements, except movable furniture, shall at once become property of Lessor and shall be surrendered to Lessor upon termination of this Lease. Lessor, at Lessor's option, may require Lessee to restore the Premises to its original condition at the termination of this Lease."

Below, the district court found that Global "provides no evidence that Erie ever took a different position under the unambiguous terms of the contract. Nor does AAI/Global show how the second element [of estoppel] could be met. Moreover, AAI/Global's quasi-estoppel argument is premised on its claim that AAI/Global funded Erie's construction projects via paying McMahon." The district court found that Global "has no facts to support this claim." *Id*. Global points to nothing in the record to show that Erie took inconsistent positions with the Lease. As a result, the district court did not err in concluding that Global's quasi-estoppel argument failed.

### b. Waiver

Global's argument on this issue, in its entirety, is a two-sentence conclusory allegation: "The issue is whether, after accepting Global's mortgage and McMahon contract payments as rent substitutes for more than six years before the property was ready to be used as a corporate retreat, Erie waived any claim for any alleged deficit. Old Erie's and Global's course of conduct over six years—without complaint—suffices to establish old Erie's waiver."

"A waiver is a voluntary, intentional relinquishment of a known right or advantage, and the party asserting the waiver must show that he acted in reasonable reliance upon it and that he thereby has altered his position to his detriment." *River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 601, 462 P.3d 120, 129 (2020) (quoting *Knipe Land Co. v. Robertson*, 151 Idaho 449, 457, 259 P.3d 595, 603 (2011)). "[T]he party proving waiver is required to show a clear intent to waive." *Pocatello Hosp., LLC v. Quail Ridge Med. Inv., LLC*, 156 Idaho 709, 719, 330 P.3d 1067, 1077 (2014). However, when a contract contains an "anti-waiver" provision, "the party asserting a waiver must show a clear intent to waive both the [anti-waiver] clause and the underlying contract provision." *Eagle Springs Homeowners Ass'n, Inc. v. Rodina*, 165 Idaho 862, 872, 454 P.3d 504, 514 (2019) (quoting 13 *Williston on Contracts* § 39:36).

The district court found no evidence to support a waiver. Recognizing that "if there is any substantial evidence in the record to support a waiver it is for the trier of fact to determine whether

21

the evidence establishes such a waiver[,]" the district court concluded, "[a]s a matter of law, this [c]ourt, on the evidentiary record before it, can say that AAI/Global has not established waiver and there is no issue of fact to require further inquiry."

There is nothing in Global's cursory argument on appeal to contradict the district court's findings and conclusion, nor does Global point to any evidence below to show it raised a genuine issue of material fact as to whether waiver was established.

### c. Laches

Laches provides a defense only when a defendant has suffered harm from a plaintiff's failure to promptly exercise its rights. *See Mountain Home Irr. Dist. v. Duffy*, 79 Idaho 435, 443, 319 P.2d 965, 969 (1957) (for the doctrine of laches to apply, "[i]t must be shown that the defendant has been misled, to his injury, by the failure of the plaintiff to assert its right earlier."). To establish the defense of laches, the plaintiff must show four things:

> (1) defendant's invasion of plaintiff's rights, (2) delay in asserting plaintiff's rights, the plaintiff having had notice and an opportunity to institute a suit, (3) lack of knowledge by defendant that plaintiff would assert his rights, and (4) injury or prejudice to defendant in the event relief is accorded to plaintiff or the suit is not held to be barred.

*Access Behav. Health v. Dep't of Health & Welfare*, 170 Idaho 874, 886, 517 P.3d 803, 815 (2022).

Global argues there is an issue of fact on its laches defense because (1) Global, in good faith, made McMahon contract payments for Erie's benefit and (2) Global could not reasonably have foreseen that there would be a chance of control over Erie after Erie would try to undo the prior arrangements." Erie responds that, for the doctrine of laches to apply, Global would have to argue that it was injured by being permitted to rent the Property at a discount for several years. If anything, Erie argues, Global benefited from the fact that Erie delayed termination of the Lease.

Global's arguments depend on this Court holding that the district court erred in failing to find evidence that Global funded Dunhill to make the McMahon construction payments on Erie's behalf or that such payments must be found to be payments by Global because Global and Dunhill are affiliates. As we have concluded, Global failed to put evidence into the record that would enable this Court to make such a holding. For this reason, we hold that the district court did not err in dismissing each of Global's affirmative defenses based on a lack of evidence in the record before it.

## B. The district court did not abuse its discretion in awarding attorney fees to Erie.

The sole argument that Global advances on this issue is, "Because the district court's summary judgment should be dismissed, if [sic] follows that the district court's fee award should be reversed too." "The awarding of attorney fees and costs is within the discretion of the district court and is subject to the abuse of discretion standard of review." *Treasure Valley Home Sols., LLC v. Chason*, 171 Idaho 655, 660, 524 P.3d 1272, 1277 (2023) (quoting *Breckenridge Prop. Fund 2016, LLC v. Wally Enters., Inc.*, 170 Idaho 649, 662, 516 P.3d 73, 86 (2022)). "The burden is on the party opposing the award to demonstrate that the district court abused its discretion." *Id.* (quoting *Lettunich v. Lettunich*, 145 Idaho 746, 749, 185 P.3d 258, 261 (2008)). Because we affirm the district court's summary judgment decision, and because Global failed to put forth argument or authority demonstrating how the district court abused its discretion in awarding attorney fees to Erie, that decision is affirmed.

**C.      Erie is entitled to attorney fees and costs on appeal.**

Global requests the Court "award Global its attorneys' fees for this appeal should it prevail" Global is not entitled to attorney fees on appeal because it failed to cite any basis for them in its brief and it did not prevail on appeal.

Erie requests fees under Idaho Code sections 12-120(3) and 12-121 and Paragraph 43 of the lease. Erie is the prevailing party on appeal, and it is entitled to an award of attorney fees under the Lease. Erie initiated the underlying lawsuit to pursue the collection of rent due under the Lease. Erie also defended against Global's appeal. Under the plain terms of Lease, Global agreed to pay "as additional rent all reasonable fees, costs, charges of enforcement and collection including attorney fees[.]" Because we award fees to Erie under that section of the Lease, we need not consider whether Erie is separately entitled to attorney fees under Idaho Code section 121-121 or 12-120(3). *See Sullivan v. BitterSweet Ranch, LLC*, 172 Idaho 755, 764, 536 P.3d 867, 876 (2023) ("Because we award attorney's fees to BitterSweet under section 34.2 of the Leases, we need not analyze whether BitterSweet is also entitled to attorney's fees pursuant to Idaho Code sections 12-121 or 12-120(3)").

## V.      CONCLUSION

For these reasons, the district court's judgment is affirmed.

JUSTICES BRODY, MOELLER, ZAHN, and MEYER CONCUR.

23